**No. 24-40671**

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

———————————

## IN RE OSCAR SILVA PEREZ, NATALIE TAYLOR, JUSTIN DOE, SALVADOR DOE, CINDY MADUENA, JESSIKA OCAMPO HERNANDEZ, RICARDO OCAMPO HERNANDEZ, GENARO PALOMINO, FODAY TURAY, JAXHIEL TURAY, CARMEN ZAYAS AND COALITION FOR HUMANE IMMIGRANT RIGHTS

———————————

Original Proceeding from the United States District Court for the Eastern District of Texas, Tyler Division
Case No. 6:24-cv-0306

———————————

### MOTION TO PROCEED PSEUDONYMOUSLY IN WRIT OF MANDAMUS

———————————

*Esther H. Sung, Karen C. Tumlin, Hillary Li, Laura Flores-Perilla, Brandon Galli-Graves*
*Justice Action Center*
*P.O. Box 27280*
*Los Angeles, CA 90027*
*(323) 450-7272*

*Paige Austin, Harold A. Solis*
*Make the Road New York*
*301 Grove St.*
*Brooklyn, NY 11237*
*(718) 418-7690*

*Counsel for Petitioners*

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ 3

STATUTORY PROVISIONS ...................................................................... 3

OTHER AUTHORITIES ............................................................................. 4

INTRODUCTION ....................................................................................... 5

BACKGROUND ......................................................................................... 6

LEGAL STANDARD ................................................................................. 9

ARGUMENT ............................................................................................ 11

I. Doe Petitioners Seek to Challenge Governmental Action..................... 11

II. Doe Petitioners Must Disclose Highly Personal and Sensitive Information of the Utmost Intimacy..................................................................................... 12

    i.    LGBTQ+ Identity and Sexual Orientation are Issues of the Utmost Intimacy. ................................................................................................ 12

    ii.    Immigration Status is Considered Highly Sensitive and Personal. ................ 14

III. Doe Petitioners and Their Family May Face Threats of Harassment or Violence if Not Allowed to Use Pseudonyms.................................................... 16

IV. Doe Petitioners' Need for Anonymity Outweighs Any Prejudice to the Parties and the Public Interest...……………………….....……………………….20

CONCLUSION ......................................................................................... 22

CERTIFICATE OF SERVICE ................................................................. 24

CERTIFICATE OF CONFERENCE ....................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Al Otro Lado, Inc. v. Nielsen*, No. 17-cv-02366-BAS-KSC, 2017 WL 6541446 (S.D. Cal. Dec. 20, 2017) ................................................................................ 23

*C.M. v. United States*, No. SA-21-CV-00234-JKP, 2021 WL 1822305 (W.D. Tex. Mar. 31, 2021) ...................................................................................... 13

*Doe v. Barrow County*, 219 F.R.D. 189 (N.D. Ga. 2003)............................... 22

*Doe v. Cath. Relief Servs.*, No. CCB-20-1815, 2020 WL 4582711 (D. Md. Aug. 10, 2020)............................................................................... 12, 15

*Doe v. Griffon Mgmt. LLC*, No. 14-2626, 2014 WL 7040390 (E.D. La. Dec. 11, 2014).......................................................................................... 12

*Doe v. Hood*, No. 3:16-CV-00789-CWR-FKB, 2017 WL 2408196 (S.D. Miss. June 2, 2017)..................................................................................... 12, 22

*Doe v. Stegall*, 653 F.2d 180 (5th Cir. 1981) ...................................... 8, 17, 22

*E.B. v. Landry*, No. 19-862-JWD-SDJ, 2020 WL 5775148 (M.D. La. Sept. 28, 2020) .................................................................................................. 11, 22

*Hispanic Interest Coalition of Alabama v. Bentley*, 691 F.3d 1236 (11th Cir. 2012) 16

*In re Sealed Case*, 931 F.3d 92 (D.C. Cir. 2019) ...................................... 18

*Int'l Refugee Assistance Project v. Trump*, No. TDC-17-0361, 2017 WL 818255 (D. Md. Mar. 1, 2017)........................................................................... 13, 14

*Lozano v. City of Hazleton*, 620 F.3d 170 (3d Cir. 2010)........................... 16

*M.A. v. U.S. Citizenship & Immigr. Servs.*, No. 1:24-cv-02040-JMC, 2024 WL 3757873 (D. Md. Aug. 12, 2024)................................................................ 14

*Plaintiff B. v. Francis*, 631 F.3d 1310 (11th Cir. 2011)................................. 9

*Rose v. Beaumont Indep. Sch. Dist.*, 240 F.R.D. 264 (E.D. Tex. 2007) ............. 10, 22

*S. Methodist Univ. Ass'n of Women L. Students v. Wynne & Jaffe*, 599 F.2d 707 (5th Cir. 1979)........................................................................................ passim

*Sealed Plaintiff v. Sealed Defendant No. 1*, 537 F.3d 185 (2d Cir. 2008) ............. 9, 18

*Texas v. Dep't of Homeland Sec.*, No. 24-40571 (5th Cir. Oct. 4, 2024) ............... 5, 7

*Texas v. Dep't of Homeland Security*, No. 6:24-cv-00306-JCB (E.D. Tex. Sep. 3, 2024)........................................................................................... 5

## STATUTORY PROVISIONS

8 U.S.C. § 1182(a)(6)(B).................................................................... 19

8 U.S.C. § 1182(a)(9)(A).................................................................... 19

8 U.S.C. § 1182(a)(9)(B)(i)(I).............................................................. 19

8 U.S.C. § 1182(a)(9)(B)(i)(II)............................................................. 19

**OTHER AUTHORITIES**

Brooke Migdon, *FBI Crime Statistics Show Anti-LGBTQ Hate Crimes on the Rise*,
 THE HILL (Oct. 16., 2023), https://thehill.com/homenews/lgbtq/4259292-fbi-
 crime-statistics-show-anti-
 lgbtq-hate-crimes-on-the-rise/ .............................................................................. 16

Implementation of Keeping Families Together, 89 Fed. Reg. 67459 (Aug. 20, 2024)
 ....................................................................................................................*passim*

**INTRODUCTION**

Proposed Doe Petitioners Salvador Doe and Justin Doe ("Doe Petitioners") seek to file a petition for writ of mandamus to vacate the district court's stay, so that Doe Petitioners and countless others like them may apply to and benefit from the Keeping Families Together Parole process (hereinafter "Keeping Families Together Parole" or "KFT Parole"). KFT Parole is a process through which certain spouses and stepchildren of U.S. citizens who meet certain criteria may apply to be considered on a case-by-case basis for parole for a period of up to three years. *See* Implementation of Keeping Families Together ("KFT Federal Register Notice" or "KFT FRN"), 89 Fed. Reg. 67459 (Aug. 20, 2024). Salvador and Justin sought to intervene in the court below, and their motion to intervene disclosed sensitive and highly personal information. The Doe Petitioners are, as described below, a married couple and are both members of the LGBTQ+ community. Salvador is a noncitizen from Mexico who has applied for Keeping Families Together Parole. Justin is the U.S.-citizen spouse of Salvador. Each Doe Petitioner reasonably fears that revealing their names would subject them and their extended family members to anti-LGBTQ+ and anti-immigrant harassment, discrimination, and possibly violence given their disclosure of highly personal details regarding their relationship and their sexuality. Although their motion to intervene was denied, both the district court and this Court made clear that Doe Petitioners and the remaining potential intervenors may renew their motion. Opinion and Order, *Texas v. Dep't of Homeland Security*,

No. 6:24-cv-00306-JCB (E.D. Tex. Sep. 3, 2024), ECF No. 49 at 9; Unpublished Opinion, *Texas v. Dep't of Homeland Sec.*, No. 24-40571 (5th Cir. Oct. 4, 2024) (per curiam), ECF No. 111-1 at 2. Should they do so, and especially should such a future motion be granted, Doe Petitioners' sensitive and highly personal information will be supplemented with additional documents and details as the case proceeds. Doe Petitioners seek to continue proceeding pseudonymously to avoid rendering themselves publicly identifiable in connection with these proceedings. Respondent States[1] will not be prejudiced by allowing Doe Petitioners to proceed using pseudonyms. Doe Petitioners have offered to provide their names and identities to all parties and the Court under an appropriate protective order, but wish to remain anonymous in public court filings, yet Respondent States still oppose the motion. Federal Respondents take no position. For the reasons set forth below and in the accompanying declarations, Doe Petitioners respectfully request the Court grant their motion to proceed pseudonymously.

## BACKGROUND

Salvador Doe is a noncitizen from Mexico who has lived in the United States since 2004. Ex. 1, Declaration of Salvador Doe ("Salvador Doe Decl."), ¶¶ 1-3. A few years after arriving in the U.S., Salvador began to recognize and accept his identity as a gay man. *Id.* at ¶¶ 5-6. This recognition made it essential for Salvador to remain in the United States, as homophobia was, and still is to this day, prevalent

---

[1] Plaintiffs in the underlying lawsuit are sixteen states including Texas, Idaho, Alabama, Arkansas, Florida, Georgia, Iowa, Kansas, Louisiana, Missouri, North Dakota, Ohio, South Carolina, South Dakota, Tennessee, and Wyoming.

within Mexico. *See* Ex. 2, Declaration of Paige Austin, Esq. ("Austin Decl."), Exs. A-G (documenting widespread homophobia and violence against LGBTQ+ people in Mexico, including in the most recent country report by the U.S. Department of State). Around 2008, Salvador met his husband, Justin Doe, and the two of them began to create a life together. Ex. 3, Declaration of Justin Doe ("Justin Doe Decl."), ¶¶ 4-5; Salvador Doe Decl. ¶ 6. In 2017, Salvador and Justin got married, and they both currently reside in Pennsylvania. Salvador Doe Decl. ¶¶ 2, 7; Justin Doe Decl. ¶¶ 2, 6.

On June 18, 2024, President Biden announced Keeping Families Together Parole. United States Citizenship and Immigration Services ("USCIS") began accepting applications for KFT Parole on August 19, 2024, and Salvador Doe had worked in advance with his attorney on his application so that he could apply that same day. Salvador Doe Decl. ¶¶ 13-14. To Salvador's knowledge, he is eligible for Keeping Families Together Parole because he entered without inspection when he arrived in the United States; he is married to a U.S. citizen spouse as of June 17, 2024; he has continuously lived in the country for over ten years; and to his knowledge he has no disqualifying criminal or immigration history. *See* KFT FRN, 89 Fed. Reg. 67461 (Aug. 20, 2024); *see also* Salvador Doe Decl. ¶¶ 1-3, 7, 14.

On August 23, 2024, Respondent States filed *Texas v. U.S. Department of Homeland Security* to challenge the lawfulness of Keeping Families Together Parole. *See* Compl., *Texas v. Dep't of Homeland Security*, No. 6:24-cv-00306-JCB

(E.D. Tex. Aug. 23, 2024), ECF No. 1. On August 26, 2024, a group of eleven individuals who are applicants for and beneficiaries of Keeping Families Together Parole, including Salvador Doe and Justin Doe, and one organization, the Coalition for Humane Immigrant Rights ("CHIRLA"), filed a motion requesting intervention in the lawsuit so that they could defend Keeping Families Together Parole alongside the federal government. Later that day, the district court issued its first of three "administrative stays" that ordered the federal government to suspend the approval of any KFT Parole applications. Days later, the district court denied intervention, prompting Petitioners to appeal on an expedited basis. Ultimately, on October 4, 2024, this Court affirmed the district court's intervention denial without analysis and lifted its extension of the district court's administrative stay. Unpublished Opinion, *Texas v. Dep't of Homeland Sec.*, No. 24-40571 (5th Cir. Oct. 4, 2024) (per curiam), ECF No. 111-1. Within hours, the district court reinstated and extended its administrative stay on KFT Parole grants through November 8, 2024. *Texas v. Dep't of Homeland Security*, No. 6:24-cv-00306-JCB (E.D. Tex. Aug. 23, 2024), ECF No. 69. Facing the prospect of a multi-month, de facto injunction without the ability to protect their distinct interests, Petitioners filed a writ of mandamus with this Court to dissolve the district court's latest administrative stay.

Including the full names of the Doe Petitioners risks revealing the Doe Petitioners' identities and destroying their privacy, which could bring about anti-LGBTQ+ and anti-immigrant harassment and discrimination against both them and

their family.

## LEGAL STANDARD

The Fifth Circuit permits parties to use pseudonyms where the parties' need to proceed anonymously outweighs the customary procedure for disclosure in judicial proceedings. *Doe v. Stegall*, 653 F.2d 180, 185-86 (5th Cir. 1981) (finding anonymity appropriate where plaintiffs "may expect extensive harassment and perhaps even violent reprisals if their identities are disclosed to a . . . community hostile to the viewpoint reflected in plaintiffs' complaint."). Although there is no "hard and fast formula" for determining when a party may proceed anonymously, *id.* at 186, this Court has articulated three factors that deserve "considerable weight" when determining whether such a need exists:

> (1) whether the case involves a challenge to a governmental activity;
>
> (2) whether the party would be compelled to disclose information "of the utmost intimacy"; and
>
> (3) whether the party would be compelled to admit their intention to engage in illegal conduct, thereby risking criminal prosecution.

*Id.* at 185-86 (quoting *S. Methodist Univ. Ass'n of Women L. Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir. 1979)).

A party need not prove all three factors to proceed anonymously, and a court is not limited in its analysis to only the three aforementioned factors. *Id.* Rather, courts may engage in "a balancing of considerations calling for maintenance of a

party's privacy against the customary and constitutionally-embedded presumption of openness in judicial proceedings." *Id.* at 186.

Other relevant factors to this inquiry may include threats of violence that the party seeking to proceed anonymously may face and the age and related vulnerability of the party. *Id.* Courts also consider whether a party's anonymity poses "a unique threat of fundamental unfairness" to the opposing party. *See Plaintiff B. v. Francis*, 631 F.3d 1310, 1316-18 (11th Cir. 2011) (considering opposing party's failure to identify any specific harm in granting moving party's anonymity request). The Second Circuit has also compiled a list of non-exhaustive factors from several circuits that courts have considered in this analysis. *Sealed Plaintiff v. Sealed Defendant No. 1*, 537 F.3d 185, 189-90 (2d Cir. 2008). Here, the most relevant of these factors include: "whether the litigation involves matters that are highly sensitive and [of a] personal nature . . . whether the suit is challenging the actions of the government or that of private parties . . . whether the defendant is prejudiced by allowing the plaintiff to press his claims anonymously . . . whether the public's interest in the litigation is furthered by requiring the plaintiff to disclose his identity . . . [and] whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigants' identities"). *Id.* (internal citations and quotation marks omitted).

In this case, the Doe Petitioners' privacy interests outweigh the customary procedure for disclosure in judicial proceedings because: (1) Doe Petitioners seek to

challenge a governmental action; (2) in order to pursue the legal intervention, Doe Petitioners are required to disclose information "of the utmost intimacy"; (3) if Doe Petitioners are not permitted to use pseudonyms, they and their family may face serious threats of harassment or violence; and (4) the need for anonymity outweighs any prejudice to Respondent States and the public interest.

## ARGUMENT

### I.    Doe Petitioners Seek to Challenge Governmental Action.

The underlying lawsuit in this case concerns a statutory challenge to a federal government policy, Keeping Families Together Parole, filed by Respondent States against the Federal Respondents. *See generally* Compl., ECF No. 1. In drawing a line between the types of cases that weigh in favor of allowing a party to proceed under pseudonym, the Fifth Circuit has recognized that cases involving "constitutional, statutory or regulatory validity of government activity" do not present the same types of concerns about reputational injury stemming from litigants proceeding anonymously as cases against private parties. *See S. Methodist Univ. Ass'n of Women L. Students*, 599 F.2d at 713. Here, Doe Petitioners are not suing a private party for wrongdoing. Doe Petitioners are seeking to defend a federal government action, the implementation of Keeping Families Together Parole, against legal attack. *See Rose v. Beaumont Indep. Sch. Dist.*, 240 F.R.D. 264, 266-67 (E.D. Tex. 2007) ("Whether the defendant is a governmental entity or a private

defendant is significant because governmental bodies do not share the concerns about 'reputation' that private individuals have when they are publicly charged with wrongdoing."); *see also E.B. v. Landry*, No. 19-862-JWD-SDJ, 2020 WL 5775148, at *2 (M.D. La. Sept. 28, 2020) (in finding that the factors weighed in favor of anonymity, the court noted that in cases that are "largely legal in nature . . . knowing the [party's] identit[y] lends little to the public's ability to follow the proceedings or understand the disposition of the case.").

## II.     Doe Petitioners Must Disclose Highly Personal and Sensitive Information of the Utmost Intimacy.

In seeking to defend Keeping Families Together Parole through legal intervention and now through mandamus proceedings, Doe Petitioners have disclosed information of the utmost intimacy about their (1) sexuality as members of the LGBTQ+ community, and (2) immigration status, which courts have found satisfy the utmost intimacy standard.

### i.     *LGBTQ+ Identity and Sexual Orientation are Issues of the Utmost Intimacy.*

Courts in the Fifth Circuit have found that the "utmost intimacy factor" is met "'[w]here the issues involved are matters of a sensitive and highly personal nature,' such as birth control, abortion, *homosexuality*, or the welfare rights of illegitimate children or abandoned families," where "the normal practice of disclosing the parties' identities yields 'to a policy of protecting privacy in a very private matter.'" *S. Methodist Univ. Ass'n of Women L. Students*, 599 F.2d at 712-13 (emphasis

added); *Doe v. Hood*, No. 3:16-CV-00789-CWR-FKB, 2017 WL 2408196, at *2 (S.D. Miss. June 2, 2017) ("The Fifth Circuit explicitly listed homosexuality among those 'matters of a sensitive and highly personal nature . . . [when] the normal practice of disclosing the parties' identities yields to a policy of protecting privacy in a very private matter.'") (quoting *S. Methodist Univ. Ass'n of Women L. Students*, 599 F.2d at 713); *Doe v. Griffon Mgmt. LLC*, No. 14-2626, 2014 WL 7040390, at *2 (E.D. La. Dec. 11, 2014) ("Examples of areas where courts have allowed pseudonyms include cases involving abortion, birth control, transexuality [sic], mental illness, welfare rights of illegitimate children, AIDS, and *homosexuality*.") (emphasis added); *see also Doe v. Cath. Relief Servs.*, No. CCB-20-1815, 2020 WL 4582711, at *1 (D. Md. Aug. 10, 2020) (finding that the party's interest in privacy regarding his sexual orientation was strong).

Here, both Salvador Doe and Justin Doe have divulged personal information that meets the "utmost intimacy factor" as relating to their relationship and sexuality. Specifically, both Salvador Doe and Justin Doe disclosed in their declarations their sexual orientation as gay men, how they met, and their relationship and marriage. *See* Salvador Doe Decl. ¶¶ 5-7 ("I began to discover and recognize my identity as a gay man . . . . [and] [Justin and I] got married in March of 2017); Justin Doe Decl. ¶¶ 4-6 ("In 2008, I met my husband, Salvador  [and] [i]n March of 2017, Salvador and I got married . . . ."). Divulging such information related to Salvador's sexual orientation and marriage was necessary to show that Salvador, an immigrant-

applicant for Keeping Families Together Parole, is eligible to apply for KFT Parole and stands to benefit from the continued operation of KFT Parole. *See* Salvador Doe Decl. ¶¶ 13-18 (explaining how he learned about KFT Parole, his understanding of his eligibility for KFT Parole, the steps he took to apply, and how based on his immigration history he would benefit from KFT Parole). Similarly, disclosure concerning Justin's sexual orientation and marriage to Salvador was required for Justin to show that Salvador is married to a U.S. citizen, a requirement for Keeping Families Together Parole. *See* Justin Doe Decl. ¶¶ 11, 13-16 (explaining the steps he and his husband took to apply for KFT Parole and how KFT Parole would be beneficial for his husband and family unity).

### ii. *Immigration Status is Considered Highly Sensitive and Personal.*

Courts have also found that disclosure of one's immigration status is highly sensitive and personal in nature so as to support a party's use of pseudonyms under certain circumstances. *C.M. v. United States*, No. SA-21-CV-00234-JKP, 2021 WL 1822305, at *2 (W.D. Tex. Mar. 31, 2021) ("[C]ourts have repeatedly recognized that a plaintiff's vulnerable immigration status is sufficiently sensitive and personal in nature to warrant the use of a pseudonym."); *see also Int'l Refugee Assistance Project v. Trump*, No. TDC-17-0361, 2017 WL 818255, at *2 (D. Md. Mar. 1, 2017) (in finding that the factors weighed in favor of granting plaintiffs' pseudonym request, the court recognized that immigration status is "a matter of sensitive and highly personal nature.") (internal citation omitted); *M.A. v. U.S. Citizenship & Immigr. Servs.*, No. 1:24-cv-02040-JMC, 2024 WL 3757873, at *2 (D. Md. Aug. 12,

2024).

In this case, as discussed *supra*, Salvador Doe is an LGBTQ+ undocumented immigrant who has applied for Keeping Families Together Parole, and although his husband has submitted an I-130 petition on Salvador's behalf to begin the process of getting him lawful status, Salvador currently has no lawful status and has applied for Keeping Families Together Parole in order to be able to remain in the United States with his husband and family while he undergoes the adjustment of status process. *See* Salvador Doe Decl. ¶¶ 3 ("I came to the United States from Mexico in 2004 . . . and I have been here ever since. I have not been admitted or paroled into the United States."),14-15, 17-18. Thus, disclosure of Salvador's immigration status was required to show his interest in benefiting from Keeping Families Together Parole. However, the fact that Salvador has no lawful status at the moment raises risks with respect to his security and ability to remain in the United States, supporting the fact that his immigration status is one that is highly sensitive and personal in nature. *See* Salvador Doe Decl. ¶¶ 17-19; *cf. Int'l Refugee Assistance Project,* No. TDC-17-0361, 2017 WL 818255, at *2 (finding that because plaintiffs were waiting for their immigration relief to be adjudicated or issued, plaintiffs "presently have a problematic immigration status that, if disclosed, could dissuade the Doe Plaintiffs from pursuing their rights in court."). Taken together, Salvador's identity as a gay man and his undocumented status raise serious privacy concerns for anonymity given the heightened risk of harassment or retaliation.

Overall, both Salvador and Justin have disclosed information of a highly sensitive and private nature—"of the utmost intimacy"—which was required for them both to show their interests as putative Defendant Intervenors in the litigation and in defending Keeping Families Together Parole. *Cf. S. Methodist Univ. Ass'n of Women L. Students*, 599 F.2d at 713 (finding that to prove their case, the party "need not reveal facts of a highly personal nature").

### III.   Doe Petitioners and Their Family May Face Threats of Harassment or Violence if Not Allowed to Use Pseudonyms.

Although "societal attitudes have become more accepting of the LGBTQ community, prejudice persists." *Cath. Relief Servs.*, 2020 WL 4582711 at *1. In recent years, hate crimes against LGBTQ+ people have significantly been on the rise compared to years prior.[2] Numerous reports, including the FBI's own annual crime report, document an increase in harassment and hate crimes against LGBTQ+ people. *See* Austin Decl., Exhs. E-F. Moreover, courts have repeatedly found that using the real names of parties in immigration-related cases can subject the immigrant party to risk of harassment and physical harm. *See, e.g.*, *Lozano v. City of Hazleton*, 620 F.3d 170, 195 (3d Cir. 2010) (finding use of pseudonyms was appropriate as "the Doe Plaintiffs, because of their unlawful status, would face an exponentially greater risk of harassment, and even physical danger, if their identities were revealed") (internal quotation marks omitted), *vacated and remanded on other grounds*, *City of*

---

[2] Brooke Migdon, FBI Crime Statistics Show Anti-LGBTQ Hate Crimes on the Rise, THE HILL (Oct. 16., 2023), https://thehill.com/homenews/lgbtq/4259292-fbi-crime-statistics-show-anti- lgbtq-hate-crimes-on-the-rise/.

*Hazleton v. Lozano*, 563 U.S. 1030 (2011); *Hispanic Interest Coalition of Alabama v. Bentley*, 691 F.3d 1236, 1247 n.8 (11th Cir. 2012) ("It is this reality that has led federal courts . . . to permit the plaintiffs to proceed anonymously in immigration-related cases.").

Consequently, given that Doe Petitioners are seeking to intervene to defend Keeping Families Together Parole against Respondent States' legal challenge, revealing Doe Petitioners' real names and identities in connection with this litigation presents a serious risk that both Salvador Doe and Justin Doe will be subjected to anti-LGBTQ+ and anti-immigrant harassment, discrimination, and even violence in the United States because of the nature of personal information they have both disclosed. *See* Salvador Doe Decl. ¶¶ 22, 24 (explaining that due to the personal details concerning his sexuality and relationship with Justin that he has shared, along with the fact that both of their real names identified together on public online sources, he fears using his real name could put him "at risk of anti-LGBTQ+ and anti-immigrant harassment or discrimination."); Justin Doe Decl. ¶ 17 (similar). The risk involved in revealing their identities as members of the LGBTQ+ community and Salvador's immigration status, coupled with their attempt to defend Keeping Families Together Parole from a legal challenge, invites "an opprobrium analogous to the infamy associated with criminal behavior" that presents serious risks of harassment and possibly violence. *See Stegall*, 653 F.2d at 186 (finding that threat of violence and harassment from a "community hostile to the viewpoint reflected in

17

plaintiffs' complaint" is a positive factor that leans in favor of allowing anonymity).

Moreover, Salvador also fears for the safety of his family in the United States, which

includes several minor nieces and nephews, should his name and identity be revealed.

*See* Salvador Doe Decl. ¶¶ 8 ("I am a proud uncle to several nieces and nephews of

all different ages, many of whom live in the same area as we do."), 24 (explaining

how his fear in revealing his real name also extends to protecting his extended family).

Courts have frequently considered the threat of violence to "innocent non-parties"

as important and "even more critical[]" to the analysis for determining whether a

party may proceed anonymously. *See, e.g.*, *In re Sealed Case*, 931 F.3d 92, 97 (D.C.

Cir. 2019); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d at 190.

Apart from harm in the United States, revealing Doe Petitioners' names may

also expose Salvador Doe to harassment, retaliation, and harm in Mexico. If Keeping

Families Together Parole is enjoined, for Salvador to continue in the adjustment of

status process he would need to move forward with consular processing—a process

that requires a noncitizen to leave the United States and travel to a consulate abroad

to obtain a new immigrant visa that allows them to return home—because he was not

inspected or admitted when he arrived in the United States in 2004. *See* Salvador

Doe Decl. ¶¶ 3, 23; KFT FRN at 67460 n.6. The consular process presents inherent

risks for individuals like Salvador, including the fact that there is no guarantee of a

visa grant; there is a possibility that he would be required to wait months or even

years waiting for consular processing; and there is the possibility that departing the

country will trigger a years-long bar on re-entry, even if he were able to successfully apply for an I-601A waiver before departing the United States in an effort to try to minimize some of these risks. *See, e.g.*, 8 U.S.C. § 1182(a)(6)(B) (in absentia removal order bar), (a)(9)(A) (prior orders of removal bar), (a)(9)(B)(i)(I)-(II) (unlawful presence bars); KFT FRN at 67474. Salvador fears a heightened risk of harm, harassment, and persecution in Mexico if his identity as a gay man and involvement in this litigation were made public. Austin Decl., Exhs. A-D; Salvador Doe Decl. ¶¶ 16, 23 ("I am aware of the fact that if [KFT] Parole is blocked . . . , my only remaining option to obtain lawful permanent residency would be to do consular processing. Because of this real possibility, I fear I could be targeted in Mexico because of my sexuality . . . . Also, if my involvement in this lawsuit were public and I used my real name . . . it's very possible I could also be subjected to potential kidnapping or ransom by drug cartels or even gangs if I were ever back in Mexico . . . ."). Salvador has witnessed this type of anti-LGBTQ+ treatment towards LGBTQ+ individuals when he lived in Mexico prior to arriving to the United States. *See* Salvador Doe Decl. ¶ 18 (explaining that when he used to live in Mexico "[he] witnessed this type of harassment of LGBTQ+ people" and based on his knowledge of the area today, he knows that "homophobia and crime due to drug cartels are prevalent in that area now."). Thus, it is likely he will encounter similar treatment if he is forced to go back to Mexico.

For the reasons set forth above, it is imperative that both Doe Petitioners be

permitted to proceed in this litigation anonymously. Notably, both Salvador Doe and Justin Doe are identified by their real names on several public, online sources relating to their involvement in their local community, such that maintaining their anonymity is essential to preserve their privacy and safety interests, both within the United States and abroad. *See* Salvador Doe Decl. ¶ 22 ("Because both my husband and I are heavily involved in our community, we have both been featured and identified together in public online sources that identify us together by name, so if our real names were connected to this lawsuit and someone who was anti-LGBTQ+ or anti-immigrant were to search for our real names, it would be very easy to identify us and figure out where we live."); Justin Doe Decl. ¶ 17 ("[B]oth my husband and I are identified by our real names in online public sources, so if we were to use our real names in this litigation, it would be easy for someone who is anti-LGBTQ+ and anti-immigrant to find out who we are and in what specific area we live.").

## IV.  Doe Petitioners' Need for Anonymity Outweighs Any Prejudice to the Parties and the Public Interest.

Lastly, allowing Doe Petitioners to proceed pseudonymously will not prejudice Respondent States' ability to litigate this case; nor will Doe Petitioners' anonymity prejudice Federal Respondents in defending against the Respondent States' legal challenge to Keeping Families Together Parole, as Federal Respondents do not oppose this motion. Doe Petitioners have offered to provide their names and identities to all the parties and the Court under an appropriate protective order in an effort to ensure there is no impact on the parties' ability to litigate the case from

granting them anonymity in public court filings, but Respondent States still oppose this motion. Nonetheless, as described *supra*, because Doe Petitioners are challenging a government action that concerns the "constitutional, statutory or regulatory validity of government activity," no such injury to the government's reputation is at issue. *See S. Methodist Univ. Ass'n of Women L. Students,* 599 F.2d at 713; *Rose*, 240 F.R.D. at 266-67. Additionally, courts have found that knowing the true names of Doe Petitioners is not in the public's interest when the issues involved are largely legal in nature, as they are here in Respondent States' legal challenge to the lawfulness of Keeping Families Together Parole, and Doe Petitioners' related petition for writ of mandamus to vacate the administrative stay below. *See Landry*, 2020 WL 5775148, at *2 (noting that in cases that are "largely legal in nature . . . knowing the [party's] identit[y] lends little to the public's ability to follow the proceedings or understand the disposition of the case.").

Relatedly, the public interest is not served by disclosing Doe Petitioners' identities. *Stegall*, 653 F.2d at 185 (explaining that equating the public's right to attend open trial with the right to know a party's real name "is not perfectly symmetrical," as "[p]arty anonymity does not obstruct the public's view of the issues joined or the court's performance in resolving them" and thus the public interest is "not inevitably compromised by allowing a party to proceed anonymously."); *Hood*, 2017 WL 2408196 at *2 (S.D. Miss. June 2, 2017) (explaining that when the public's interest in the proceedings "pertain[] more to its outcome than to its individual

participants" there is an "atypically weak public interest in knowing the litigants' identities") (internal citations omitted); *see also Doe v. Barrow County*, 219 F.R.D. 189, 192-93 (N.D. Ga. 2003) (finding that the public's interest in open judicial proceedings would not be affected by the party proceeding anonymously).

Although the public has an interest in seeing important questions on immigration litigated, on balance and in a case like this, such an interest is *de minimis* compared to Doe Petitioners' strong interests in maintaining their own privacy and safety, which extends to their family. In fact, exposing the identities of Doe Petitioners would create a risk of deterring immigrants in the future, including immigrants with sensitivities that warrant anonymity, from participating in litigation on cases of national significance that raise important questions on immigration. *See Al Otro Lado, Inc. v. Nielsen*, No. 17-cv-02366-BAS-KSC, 2017 WL 6541446, at *7 (S.D. Cal. Dec. 20, 2017) (recognizing that requiring asylum seekers to use their real names despite their fears of the harms they have sought to flee "creates an unnecessary risk of chilling the willingness of asylum seekers from litigating important issues like the ones raised in this case.").

## CONCLUSION

For the foregoing reasons, Proposed Doe Petitioners respectfully request the Court's leave to proceed using pseudonyms.

Dated: October 11, 2024                    Respectfully submitted,

**Paige Austin**
New York Bar No. 5246954
paige.austin@maketheroadny.org

**Harold A. Solis**
New York Bar No. 5122726
Harold.Solis@maketheroadny.org

MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Telephone: (718) 418-7690
Facsimile: (866) 420-9169

*/s/ Esther H. Sung*
**Esther H. Sung (Lead Attorney)** California Bar No. 255962
esther.sung@justiceactioncenter.org

**Karen C. Tumlin**
California Bar No. 234961
karen.tumlin@justiceactioncenter.org

**Hillary Li***

Georgia Bar No. 898375
hillary.li@justiceactioncenter.org

**Laura Flores-Perilla**
California Bar No. 355645
laura.flores-perilla@justiceactioncenter.org

**Brandon Galli-Graves**
Texas Bar No. 24132050
brandon.galli-graves@justiceactioncenter.org

JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
Facsimile: (323) 450-7276

*Application for admission forthcoming*

*Counsel for Proposed Doe Petitioners*

## CERTIFICATE OF SERVICE

I, Esther H. Sung, hereby certify that on October 11, 2024, this document has been filed with the clerk of the court and served by ECF or email upon counsel of record in the underlying litigation, *Texas v. Department of Homeland Security*.

I further certify that some of the participants in the case are not registered CM/ECF users. I have emailed and/or mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Honorable John Campbell Barker
United States District Clerk's Office
United States Courthouse
211 W. Ferguson
Tyler, TX 75702

*/s/ Esther H. Sung*
Esther H. Sung

## CERTIFICATE OF CONFERENCE

Counsel for Proposed Doe Petitioners have complied with the meet and confer requirement in Local Rule CV-7(h). On October 10, 2024, Federal Respondents communicated to Proposed Doe Petitioners' counsel that they take no position regarding this motion. State Respondents, however, do oppose this motion and communicated the following to Proposed Doe Petitioners' counsel: "Texas opposes this motion because the district court has already denied intervention and this Court has affirmed. *See Texas v. U.S. Dep't of Homeland Sec*., No. 24-40571, 2024 WL 4404421, at *1 (5th Cir. Oct. 4, 2024). Texas does not intend to file an opposition to this motion but will file an answer to the associated petition for mandamus if the Court orders the State to do so pursuant to Federal Rule of Appellate Procedure 21(b)(1)."

*/s/ Esther H. Sung*
Esther H. Sung

**CERTIFICATE OF COMPLIANCE
WITH LENGTH LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE
STYLE REQUIREMENTS**

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify the following:

1. The foregoing brief complies with the length limitations of Rule 27(d)(2)(A). The brief contains 4,661 words according to the Microsoft Word word-counting function, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. The foregoing brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman type style.

*/s/ Esther H. Sung*
Esther H. Sung

**Exhibit 1:** Declaration of Salvador Doe

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | |
| *Plaintiffs*, | |
| v. | No.: 6:24-cv-0306 |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| *Defendants*. | |

**DECLARATION OF SALVADOR DOE
(pursuant to 28 U.S.C. § 1746)**

**DECLARATION OF SALVADOR DOE**

I, Salvador Doe, upon my personal knowledge, hereby declare as follows:

1. I was born in Cerano, Yuriria, Mexico in 1981. I am a national of Mexico.

2. I currently live in Reading, Pennsylvania with my husband, Justin. I come from a large family—I am one of 11 children—and most of my immediate family members live in the Reading area, too. I have lived here for twenty years, since 2004.

3. I came to the United States from Mexico in 2004, when I was 22, and I have been here ever since. I have not been admitted or paroled into the United States. I came to the United States because I wanted to build a better life for myself. My goal at the time was to look for better opportunities for myself, in a place where three of my siblings already were. But as I came to recognize and accept my identity as a gay man it also became essential to my safety to stay here. It became essential to my safety to stay here due to rampant anti-LGBTQ+ sentiment and discrimination in Mexico.

4. I am currently working in home renovations in the area. In Mexico, I worked in accounting, but I knew when I came to the United States that I would have to work any job that was available to me. I also know that I could not really get the full benefit of getting an education given my status. So when I came here, my brother was working in home renovation and brought me along with him to his job, and I worked with him for about two years after I arrived in this country. Over time, I realized I liked the work, and I began adding new skills I was learning from each project I was on. I learned a lot from my brother during that time and I'm grateful that he was there to help me as I started out in home renovation.

5. In 2005, about a year after I arrived in the United States, I began to discover and recognize my identity as a gay man. I realized that members of the LGBTQ+ community

were more accepted here than in Mexico, and that made me feel more comfortable as I continued to build my life and my own community here. But I did not come out publicly until years later as it took me some time to accept my truth.

6.  Around my 27th birthday, it all just broke down in me. I was sad to be living a life I didn't want to be living, where I kept rejecting my full identity. So, on my 27th birthday, I decided to start living my true and full life. Soon after, I went to a gay bar in the area for the first time, where I met my husband, Justin. We have been together and inseparable ever since. In 2014, we bought our first home, where we love to just enjoy each other's company and entertain our family and friends when they come over.

7.  We got married in March of 2017 in Reading, Pennsylvania. We had a small wedding at a Victorian mansion that is now a bed and breakfast in the area, with only six people in attendance. Before then, we had been talking about marriage for a while, and we knew what we had together and the love we had for one another. We wanted to spend the rest of our lives together, so we were ready to take this step and get married.

8.  Justin and I have created a wonderful life together. We have melded our friends, families, and communities together. We do not have any children, but I have a lot of family here in the Reading area. I am a proud uncle to several nieces and nephews of all different ages, many of whom live in the same area as we do.

9.  Around 2016, my sister was having a difficult time. We wanted to support her, so my sister and her two young children moved in with us for five years. During that time, Justin and I helped raise her children by feeding them every day, doing school pick-up and drop-off, and being a support system for all of them during that time.  While we had a lot of extra obligations in helping raise my sister's children at that time, we were glad to

be there for my sister when she needed it. They are still a big part of our lives, and we care for them to this day. I am like a second father to my sister's children because of that experience.  Overall, I am really close to my family, and we all support each other however and whenever we can.

10. We both have strong ties to our broader community as well. Our neighborhood is very active and holds events and gatherings year-round that we are regularly part of, like tours of the community garden, a party in the park for the community with food and live music, LGBTQ+ Pride events, and seasonal events like handing out candy to children in the park during Halloween and a Christmas tree lighting during the wintertime.

11. As long-time residents of our neighborhood, Justin and I are very invested in the community and committed to making it one that is welcoming and open, diverse, and preserves the architectural integrity of the neighborhood. For example, I frequently volunteer by helping salvage older building materials and items that can be recycled and repurposed for renovations and other uses in the community.

12. Justin and I have now been together for almost sixteen years and married for over seven years, and I feel so lucky to have found him. But because I am undocumented, it has always been at the back of my mind that one day everything could change and I could be separated from my whole life here: my family, my community, and my husband. We have dreams of traveling internationally one day, specifically to France, and we hope that one day we can resolve my immigration status so we can do this together as a couple. We have been working with an immigration attorney who has been helping me explore what options I have in addressing my immigration status.

13. A few days after President Biden announced the new parole-in-place process ("Keeping Families Together Parole") in June, my immigration attorney called me to let me know about it. Since my immigration attorney was familiar with my history and case, she mentioned right away that we would likely meet the qualifications for this parole process. I felt excited about the possibility that this could allow me to get on a path to adjusting my status without having to leave the country. I set up an appointment with her and began to gather all the documents we needed for the application. We then met with my immigration attorney on Sunday, August 18, the day before the Keeping Families Together applications opened, so we could make sure we were ready to submit our application as soon as the United States Citizenship and Immigration Services ("USCIS") began accepting applications the next day, on Monday, August 19.

14. On August 19, we submitted to USCIS a Form I-131F, Application for Parole in Place for Certain Noncitizens Spouses and Stepchildren of U.S. Citizens, so I can be considered for Keeping Families Together Parole. In addition to my biographical information, the form asked for details about my immigration history, any criminal history, and my marriage. I was also required to submit supporting documents to show that I meet the eligibility criteria for Keeping Families Together Parole. These documents include proof that I have been continuously present in the United States for at least ten years and that I am legally married to my husband, Justin, a U.S. citizen. To my knowledge, I meet the eligibility criteria for Keeping Families Together Parole.

15. My husband has filed an I-130 petition for me that has been approved, and he will support me in later applying for adjustment of status so I can get on a path to hopefully become a U.S. citizen one day. Long after arriving in this country in 2004, I learned that I

had a removal order pending against me. I worked with my immigration attorney to file a motion to reopen that old order, which was recently granted by the Philadelphia Executive Office for Immigration Review ("EOIR"). To my knowledge, the only barrier for me to adjust my status in removal proceedings—or before USCIS, if those proceedings are terminated—is the fact that I was not "admitted or paroled" into the United States when I initially came here.

16. I have not applied for an I-601A Provisional Unlawful Presence Waiver because my motion to reopen was still pending with the immigration court until very recently and that needed to be resolved first. If I were to leave the country for consular processing while my motion to reopen was pending, even with the I-601A waiver, this could present a serious risk of getting stuck outside the United States and not being able to return to my husband and family possibly for years.

17. The Keeping Families Together Parole process presents an incredible opportunity for me for many reasons. First, a grant of parole under Keeping Families Together would greatly benefit me in my path in seeking lawful permanent residency. Now that my old removal order has been terminated, I have an immigration court date in March of 2025. If I were to receive a grant of parole under Keeping Families Together, then the judge in my immigration case could terminate my case to allow me to adjust status before USCIS or could adjudicate my adjustment application herself. That would be ideal for me because the other possible avenues for relief, like cancellation of removal, would likely be more complex and take longer to complete. It would also take fewer resources on the part of EOIR or USCIS because my adjustment is a straightforward application.

18. Also, if I were granted parole, I would be allowed to remain in the United States with my husband, family, and larger community, instead of potentially getting stranded in Mexico while waiting for a visa through consular processing. The thought of returning to Mexico and getting stuck there due to delays or a bar on returning, alone and without my support system here, is scary to think about, especially considering that it would be more dangerous for me in Mexico as someone that's part of the LGBTQ+ community and who could also be targeted for returning from the United States. My main ties in Mexico are in my small hometown within Cerano, and back when I lived there, I witnessed this type of harassment of LGBTQ+ people. Unfortunately, based on what I have heard from my family and friends who are still connected to the area and live in the area, homophobia and crime due to drug cartels are prevalent in that area now.

19. Lastly, Keeping Families Together Parole would allow me to benefit from work authorization for the first time since coming to this country. I have always been working while here and contributing to the economy but never had the security that comes with work authorization. With work authorization, I could have more security in my work, expand my client base in home renovation, and possibly be able to save for retirement one day.

20. I have lived in this country all my adult life; this country has been my true home and is where almost all my family resides. That is why the Keeping Families Together Parole process would mean a lot to me. Even after being here for twenty years, it is still scary to think that something could happen that could separate me from my husband, family, and the incredible life we have here. My ability to remain in the United States with Justin and

continue living the life we've built together as I work to become a U.S. citizen would be life-changing and provide such peace of mind for the both of us.

21. I decided to join this intervention because I believe Keeping Families Together Parole has the power to help so many mixed-status couples and families—including me and my husband and extended family—stay together in the United States without fear of being deported or separated from their loved ones when going through consular processing. I also believe sharing my story about how this parole process could benefit me and my family is important in ensuring that it remains open.

22. But still, because of the highly personal information disclosed in this declaration and further information that may be disclosed throughout the course of this litigation, including information about my husband's and my sexuality and relationship, I am afraid of using my real name. Because both my husband and I are heavily involved in our community, we have both been featured and identified together in public online sources that identify us together by name, so if our real names were connected to this lawsuit and someone who was anti-LGBTQ+ or anti-immigrant were to search for our real names, it would be very easy to identify us and figure out where we live.

23. I am aware of the fact that if Keeping Families Together Parole is blocked from continuing, my only remaining option to obtain lawful permanent residency would be to do consular processing. Because of this real possibility, I fear I could be targeted in Mexico because of my sexuality, which is not accepted well in the area where I come from and in other areas of Mexico. Also, if my involvement in this lawsuit were public and I used my real name in this lawsuit, which involves the states and the U.S. federal government, it's very possible I could also be subjected to potential kidnapping or ransom

by drug cartels or even gangs if I were ever back in Mexico due to my involvement in this lawsuit.

24. Given that this litigation concerns a nationwide program that is public on a national level, I fear that if my real name and connection with this intervention is publicly known, I could be at risk of anti-LGBTQ+ and anti-immigrant harassment or discrimination, as could my family.

25. Although I feel strongly that it is important for me to stand up for the opportunities and benefits Keeping Families Together Parole represents for me and for others like me, I am cognizant that my involvement in this litigation will identify me to others in my state and in this country who agree with the Plaintiff States and do not care about whether I am forced to live in fear of being deported, or whether being removed will tear my life or family apart, the life and family I have worked so hard to build up with my husband and family here in the United States. I want to protect myself, my husband, and my family from that.

26. For this reason, I respectfully ask the court to allow me to proceed as a defendant intervenor in this lawsuit under a pseudonym, to protect myself and my family.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed at Reading, Pennsylvania on August 25, 2024.



Salvador Doe

**Exhibit 2:** Declaration of Paige Austin

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

STATE OF TEXAS, *et al.*,

        *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

        *Defendants*.

No.: 6:24-cv-0306

**DECLARATION OF PAIGE AUSTIN, ESQ.**
**(pursuant to 28 U.S.C. § 1746)**

## DECLARATION OF PAIGE AUSTIN, ESQ.

I, Paige Austin, declare under penalty of perjury the following is true and correct:

1.      I am an attorney at Make the Road New York ("MRNY"), with my office located at 301 Grove St. Brooklyn, NY 11237. I am admitted to practice law in the state of New York and before the Court of Appeals for the Fifth Circuit.

2.      I submit this declaration to identify several articles and reports relevant to the Doe Intervenors' motion to proceed pseudonymously as defendant-intervenors in this case.

3.      The most recent country report on Mexico by the U.S. Department of State states that among "significant human rights issues" in Mexico are "crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, and intersex persons." The report further states that in 2023 "[t]here were reports the government did not always investigate and punish those complicit in abuses against LGBTQI+ persons. Civil society groups claimed police routinely subjected LGBTQI+ persons to mistreatment while in custody." An excerpt of the relevant portion of that report is attached as **Exhibit A.**

4.      An article by the Associated Press earlier this year entitled *Wave of transgender slayings in Mexico spurs anger and protests by LGBTQ community* stated, "Gay and transgender populations are regularly attacked and killed in Mexico, a nation marked by its 'macho' and highly religious population. The brutality of some of the attacks is meant to send a message to queer people that they are not welcome in society." It also stated that "Over the past six years, the rights group Letra S has documented at least 513 targeted killings of LGBTQ people in Mexico." A copy of this article, which is available online at https://www.nbcnews.com/nbc-out/out-news/wave-transgender-slayings-mexico-spurs-anger-protests-lgbtq-community-rcna134075, is attached as **Exhibit B.**

5.      In its submission to the 73rd Session of the United Nations Committee on Torture in 2022, the organization Advocates for Human Rights documented that "lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons, continues to increase throughout Mexico. The problem is compounded by criminal gang activities, as well as the lack of an independent and impartial system for combatting impunity, fighting corruption, and carrying out independent and impartial criminal investigations." It added that despite some legal provisions intended to safeguard this population, "lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons in Mexico continue to experience discrimination, harassment, and the threat of violence." That submission is attached hereto as **Exhibit C**.

6.      In its *Concluding Observations on the Sixth Periodic Report on Mexico*, the Office of the United Nations High Commissioner for Human Rights noted "The Committee is concerned about the discrimination and the high level of violence, including a large number of homicides, that are motivated by the victim's sexual orientation or gender identity and regrets that consolidated data on investigations and prosecutions initiated, convictions and punishments handed down and reparations granted in such cases are not available." An excerpt of that report, available at https://docstore.ohchr.org/SelfServices/FilesHandler.ashx?enc=6QkG1d%2FPPRiCAqhKb7yhsn n3otTjgQWftWGGStAtK%2FC%2FYaADRZzF%2FUt%2F29mCSBqslnJw9k2ZuWX1QQBsn w8x%2FeraJ6T8nBuzoAp%2FTyuwBkpPM71V9flIZoyvdNO76hUA, is attached as **Exhibit D.** The same committee is currently reviewing Mexico's compliance with the International Covenant on Civil and Political Rights again but has not yet published its concluding observations.

7.      Several organizations have documented a rise in anti-LGBTQ harassment and violence in the U.S. in recent years. An ABC News article in mid-2023 described two different reports that "capture the growing anti-LGBTQ+ extremism across the U.S., that has led to protests, threats and

violence against the queer community." The article, available at https://abcnews.go.com/US/rise-anti-lgbtq-hate-extremism-captured-new-reports/story?id=100304706, is attached as **Exhibit E.**

8.      The FBI has also documented this trend, with a rise in hate crimes against LGBTQ people documented in 2022, the last year for which it has released its annual crime report. This rise is described in a press release from the Human Rights Campaign, available at https://www.hrc.org/press-releases/fbis-annual-crime-report-amid-state-of-emergency-anti-lgbtq-hate-crimes-hit-staggering-record-highs and included as **Exhibit F.** That increase followed an even sharper increase the year before, also captured by the FBI. An article from The Hill detailing this rise, available at https://thehill.com/homenews/lgbtq/4259292-fbi-crime-statistics-show-anti-lgbtq-hate-crimes-on-the-rise/, is included as **Exhibit G**.

I, Paige Austin, declare under penalty of perjury that the foregoing is true and correct.

Date: August 25, 2024                              _____
Brooklyn, NY                                        Paige Austin, Esq.

# EXHIBIT A
## To Austin Decl.

# Mexico 2023 Human Rights Report

## Executive Summary

There were no significant changes in the human rights situation in Mexico during the year.

Significant human rights issues included credible reports of: unlawful or arbitrary killings, including extrajudicial killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; serious restrictions on freedom of expression and media freedom, including violence against journalists and enforcement of or threat to enforce criminal libel laws to limit expression; serious government corruption; extensive gender-based violence, including domestic or intimate partner violence, sexual violence, workplace violence, child, early, and forced marriage, femicide, and other forms of such violence; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; crimes involving violence or threats of violence targeting persons with disabilities; and significant or systematic restrictions on workers' freedom of association, including crimes of violence and intimidation against workers.

The government generally took credible steps to identify and punish officials who may have committed human rights abuses.

Criminal elements, including local and transnational gangs and narcotics traffickers, were significant perpetrators of violent crimes and committed acts of homicide, torture, kidnapping, extortion, human trafficking, bribery, intimidation, and other threats, resulting in high levels of violence and exploitation. The government investigated and prosecuted some of these crimes, but the majority remained uninvestigated and unprosecuted.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were several reports that government entities or their agents committed arbitrary or unlawful killings, including extrajudicial killings, during the year.

On February 26, members of the Secretariat of National Defense's (SEDENA) 16th Motorized Calvary Regiment shot at a vehicle in Nuevo Laredo, Tamaulipas, killing five civilians and wounding one other. On April 10, a civilian federal judge ordered the detention of four SEDENA soldiers on charges of attempted homicide in the incident. Additional SEDENA soldiers could face lesser charges for not preventing the incident.

Between January and June 30, the civil society organization Central Committee (Comité Central) found 3 percent of social media content mentioning Jewish persons was antisemitic.

Jewish community representatives reported good cooperation with the government in addressing instances of antisemitic acts.

For further information on incidents in the country of antisemitism, whether or not those incidents were motivated by religion, and for reporting on the ability of Jews to exercise freedom of religion or belief, please see the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Acts of Violence, Criminalization, and Other Abuses Based on Sexual Orientation, Gender Identity or Expression, or Sex Characteristics

**Criminalization:**  No laws criminalized consensual same-sex sexual conduct between adults, cross-dressing, or other sexual or gender characteristic-related behavior.  There were no reports that neutral laws (e.g., on statutory

rape, immorality, or loitering) were disproportionately applied to LGBTQI+ persons.

**Violence and Harassment:** There were reports the government did not always investigate and punish those complicit in abuses against LGBTQI+ persons, especially outside Mexico City. Civil society groups claimed police routinely subjected LGBTQI+ persons to mistreatment while in custody.

In 2022, there were 87 killings of individuals who identified as LGBTQI+, of whom 48 were transgender, that could have been motivated by their sexual identity, according to civil society groups.

On July 15, assailants killed Ulises Nava Juárez, LGBTQI+ rights defender and head of the Department of Sexual Diversity at the Autonomous University of Guerrero, as he left the National Congress of Strategic Litigation for the Defense of Rainbow Quotas, in Aguascalientes. As of July 31, the UN Office of the High Commissioner for Human Rights documented seven killings of human rights activists, two of whom were LGBTQI+ advocates.

According to CONAPRED, the most frequent forms of aggression LGBTQI+ persons experienced were verbal violence; denial of entry, services, and rights; and killings.

**Discrimination:** Federal law prohibited discrimination against LGBTQI+ individuals. The government generally did not enforce the law. A Mexico City municipal law provided increased penalties for hate crimes based on

sexual orientation and gender identity. As of November 16, Mexico City and the states of Baja California, Campeche, Chiapas, Chihuahua, Coahuila, Colima, Guanajuato, Morelos, Querétaro, San Luis Potosí, and Yucatán allowed LGBTQI+ couples and families adoption rights.

The 2021 National Survey of Sexual Diversity and Gender found that of three million employed LGBTQI+ individuals, one-third reported experiencing discrimination in the past 12 months. In March, a professor who identified as gay was fired for alleged sexual misconduct in Álvaro Obregón, Durango, prompting student protests that the school's director had filed false charges against him. From January to August 23, CONAPRED registered 22 reports of discrimination against LGBTQI+ persons.

**Availability of Legal Gender Recognition:** Twenty states permitted adult individuals and eight states allowed children 12 years and older to update names and gender markers via a simple administrative process. In May, for the first time, the Secretariat of Foreign Affairs issued passports with "X" as a third sex designation option.

**Involuntary or Coercive Medical or Psychological Practices:** Sixteen states banned so-called conversion therapy practices. According to INEGI, 14 percent of transgender persons and 10 percent of lesbian, gay, and bisexual persons were subjected to so-called conversion therapy practices. Civil society organizations reported that, as part of the treatment process, LGBTQI+ persons undergoing so-called conversion therapy practices were

often isolated, beaten, given electroshocks, and made to undergo hormone or steroid therapies, among other actions.

Medically unnecessary surgeries and treatment continued to be done on infants and children born with sex characteristics that did not align with either a typical male or female body.  There were no reports of such surgeries done on nonconsenting intersex adults.

**Restrictions of Freedom of Expression, Association, or Peaceful Assembly:** There were no reports of restrictions on freedom of expression, association, or peaceful assembly related to LGBTQI+ matters.

# Persons with Disabilities

Public buildings and facilities often did not comply with the law requiring access for persons with disabilities.  Federal law prohibited discrimination against persons with physical, sensory, intellectual, and mental disabilities.  The government did not effectively enforce the law.  According to the 2021 INGEI survey on the dynamics of household relationships, 73 percent of the six million women and girls older than 15 who identified having disabilities reported experiencing violence.  On June 7, the government enacted the National Code of Civil and Family Procedures, championed by disability advocacy groups.  The legislation established the right to independently decide and make decisions with appropriate support for persons with disabilities older than 18.

# EXHIBIT B
## To Austin Decl.

OUT NEWS

# Wave of transgender slayings in Mexico spurs anger and protests by LGBTQ community

Over the past six years, the rights group Letra S has documented over 500 targeted killings of LGBTQ people in Mexico.



—— Adolfo Voorduin and Nancy Martinez embrace during a rally Monday by members of the LGBTQ community to protest the murder of transgender activist Samantha Gomes Fonseca in Mexico City.

Marco Ugarte / AP

Jan. 16, 2024, 9:19 AM EST / Source: The Associated Press

**By The Associated Press**

MEXICO CITY – Authorities in Mexico said at least three transgender people were killed in the first two weeks of 2024, and rights groups were investigating two additional such cases. The slayings marked a violent start to the year in a country where the LGBTQ community is often targeted.

The latest death came on Sunday, when transgender activist and politician Samantha Gómez Fonseca was shot multiple times and slain inside a car in the south of Mexico City, according to local prosecutors.

The killings spurred outrage among members of the LGBTQ community who protested in Mexico City's main throughway on Monday.



—— A member of the LGBTQ community holds a portrait of transgender activist Samantha Gomes Fonseca. `Marco Ugarte / AP`

Around 100 people marched chanting: "Samantha listen, we're fighting for you" and carrying signs reading "your hate speech kills." Another group of protesters earlier in the day spray

painted the words "trans lives matter" on the walls of Mexico's National Palace.

Fonseca, the activist and politician slain on Sunday, originally intended to march alongside other activists to call for greater acceptance of transgender people in society. After her death, the march quickly turned into a call for justice and for more comprehensive laws around hate crimes.

Paulina Carrazco, a 41-year-old trans woman among the marchers, said it felt like "the violence was knocking on our front door."

"We are scared, but with that fear we're going to keep fighting," Carrazco said. "We're going to do everything in our power so the next generations won't have to live in fear."

Gay and transgender populations are regularly attacked and killed in Mexico, a nation marked by its "macho" and highly religious population. The brutality of some of the attacks is meant to send a message to queer people that they are not welcome in society.

Over the past six years, the rights group Letra S has documented at least 513 targeted killings of LGBTQ people in Mexico. Just last year, the violent death of one of the most recognizable LGBTQ figured in Mexico, Ociel Baena, sparked a similar wave of outrage and protests.

Some like 55-year-old Xomalia Ramírez said the violence was a partly consequence of comments made by Mexican President Andrés Manuel López Obrador last week when he described a transgender congresswoman as "man dressed as a woman."

While López Obrador later apologized, marchers like Ramírez, a transgender woman from the southern state of Oaxaca, said it was too little too late.

Ramírez said women like her struggle to find work and when they do, their gender identity is regularly ignored. Working as a Spanish teacher, she said her bosses force her to wear men's clothes to work.

"If I want to work, I have to disguise myself as a man," Ramírez said. "If I don't, I won't eat."

"These comments by the president have created transphobia and resulted in hate crimes against the trans community," Ramírez added.

Last week, a transgender activist, Miriam Nohemí Ríos, was shot to death while working in her business in the central Mexican state of Michoacán.

On Saturday, authorities in the central state of Jalisco said they found a transgender person's body laying in a ravine with gunshot wounds.

Two other cases, were not immediately confirmed by law enforcement, but were registered by rights groups who said they often struggle to get details from officials in their efforts to document hate crimes.

One transgender woman known as "Ivonne" was slain alongside her partner in the southern state of Veracruz, according to the National Observatory of Hate Crimes Against LGBTI people.

Meanwhile, Letra S. documented the killing of transgender stylist Gaby Ortíz, whose body was found in the Hidalgo state. Local media, citing local authorities, said her body was found on the side of the road next to "a threatening message" written on a piece of cardboard.

Law enforcement said they would investigate the violent deaths but the activists said they doubted anything would come of the cases. Due to high levels of corruption and overall disfunction in Mexico's government, around 99% of crimes in Mexico go unsolved.

"It's very likely that cases like this will end in impunity," said Jair Martínez, an analyst for Letra S.



The Associated Press

# EXHIBIT C

## To Austin Decl.



**Mexico's Compliance with the Convention Against Torture**
**Suggested List of Issues Prior to Reporting**

**Submitted by The Advocates for Human Rights**
a non-governmental organization in special consultative status with ECOSOC since 1996

**73rd Session of the Committee Against Torture**
**19 April–13 May 2022**

**Submitted 24 January 2022**

**The Advocates for Human Rights** (The Advocates) is a volunteer-based non-governmental organization committed to the impartial promotion and protection of international human rights standards and the rule of law. Established in 1983, The Advocates conducts a range of programs to promote human rights in the United States and around the world, including monitoring and fact finding, direct legal representation, education and training, and publications. The Advocates is the primary provider of legal services to low-income asylum seekers in the Upper Midwest region of the United States. A growing number of victims fleeing extrajudicial killings, gender-based violence, and violence targeting LGBTI persons in Mexico have requested legal assistance from The Advocates in applying for asylum in the United States. First-hand information from asylum-seekers about the human rights violations that they experienced in Mexico has been used in this submission with their permission.

330 Second Avenue South • Suite 800 • Minneapolis, MN 55401 • USA
Tel: 612-341-3302 • Fax: 612-341-2971 • Email: hrights@advrights.org •
www.TheAdvocatesForHumanRights.org

# EXECUTIVE SUMMARY

1. Widespread violence, particularly gender-based violence and violence targeting lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons, continues to increase throughout Mexico. The problem is compounded by criminal gang activities, as well as the lack of an independent and impartial system for combatting impunity, fighting corruption, and carrying out independent and impartial criminal investigations.

2. Despite significant reforms to the criminal justice system, individuals continue to lack adequate protection from violence and human rights abuses to which law enforcement is complicit, if not directly involved. Even where cases are brought to trial, there is significant pressure against the pursuit of justice on behalf of victims of human rights abuses.

3. The 2007 General Law on Women's Access to a Life Free of Violence has not been fully implemented across Mexico. Further, certain legal mechanisms introduced under the General Law have not proven to be effective, as violence against women remains a major concern. In 2020, 3,723 Mexican women were victims of homicide. The government inadequately investigates most cases of gender-based violence, with perpetrators enjoying impunity. Moreover, LGBTI persons in Mexico experience discrimination, harassment, and the threat of violence; murders of LGBTI persons occur at a rate of nearly six homicides per month.

4. The Advocates for Human Rights has received direct information about extrajudicial killings, gender-based violence, and violence and ill-treatment targeting LGBTI persons in Mexico, as well as problems with impunity and police corruption, from survivors seeking asylum in the United States.[1] The firsthand experiences of The Advocates' asylum clients confirm that the legal system and policies in Mexico fail to provide individuals with adequate protection from violence and human rights abuses to which law enforcement is complicit, if not directly involved.

### Mexico fails to uphold its obligations under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

5. As a State party to the Convention Against Torture (CAT), Mexico has an obligation to ensure that no person, including women and LGBTI individuals, are subjected to torture or to cruel, inhuman or degrading treatment or punishment. This duty extends to prohibiting, preventing, investigating, and providing redress for torture and ill-treatment, including making such acts offenses under domestic criminal law.[2] A State may violate the Convention Against Torture both by directly committing, instigating, inciting or

---

[1] The case information presented in this submission is compiled from intake and other interviews conducted by The Advocates for Human Rights with asylum seekers from Mexico between 2020 and 2021 (Hereinafter referred to as "Interviews conducted by The Advocates (2020-2021)). Some details have been removed to maintain confidentiality and to protect the identities of clients and their families. Information has been used with permission.

[2] United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment *(hereinafter referred to as* "CAT") 1984, Arts. 1, 2, 4(1), 10, 12, 13, 14 and 16.  See also Committee Against Torture, *General Comment No. 2*, (24 January 2008), U.N. Doc.  CAT/C/GC/2.

encouraging such acts, or by acquiescing or failing to take steps to deal with such acts by private or public actors.[3]

## I.     The State Party fails to address the use of torture, ill-treatment, and inhumane conditions in detention centers.

6.  In its July 2019 Concluding Observations, the Committee expressed concern about Mexico's continued use of torture and ill-treatment in obtaining confessions and regrets the State Party's failure to provide information about court decisions excluding confessions obtained through torture or ill-treatment.[4]

7.  Security forces continue to use torture with impunity. At the State level, from 2016 to 2019, 21,360 criminal investigations for torture were initiated but resulted in only 16 sentences. At the federal level, 13,560 criminal investigations for the same crime and time were initiated but resulted in just 30 preliminary inquiries, a rate of implementation less than 0.25%.[5]

8.  To prove an allegation of torture, it is often required to undergo a medical forensic examination. The State, however, makes it very difficult for victims to access official forensic examination services, forcing victims to resort to independent forensic experts who also report difficulty in gaining access to their clients.[6]

9.  One client of the Advocates experienced cruel and inhumane conditions of detention after drug cartel members working with police arrested him. The client was jailed for five months and kept in solitary confinement next to a sewage tank for much of that time. His family was only able to secure his release after hiring a forensic attorney from another area. In retaliation for hiring the forensic attorney, cartel members attempted to kidnap the client's cousin and father.[7]

10.  **Suggested questions relating to use of torture and inhumane conditions in detention centers:**

- What steps has the government of Mexico taken toward effective and impartial investigation and prosecution of allegations of torture by security forces?

- What steps has Mexico taken to provide victims of torture access to timely and independent forensic examination?

---

[3] Committee Against Torture, *General Comment No. 2*, (24 January 2008), U.N. Doc.  CAT/C/GC/2, ¶ 15-19.
[4] Committee Against Torture, *Concluding observations on the seventh periodic report of Mexico*, (24 July 2019), U.N. Doc. CAT/C/MEX/CO/7 ¶ 20, 22.
[5] Colectivo vs la impunidemia, *Fiscalómetro*, Colectivo vs la impunidemia (2020), 22. Also available online at: https://www.wola.org/wp-content/uploads/2020/10/FISCAL%C3%93METRO.pdf.
[6] Amnesty International, *Mexico must face up and investigate widespread torture after scathing UN report*, (January 14, 2022), https://www.amnesty.org/en/latest/news/2015/03/mexico-must-face-up-and-investigate-widespread-torture-after-scathing-un-report/.
[7] Interviews conducted by The Advocates (2020-2021).

## II. The State Party fails to address impunity for human rights abuses by organized criminal gangs.

11. In its July 2019 Concluding Observations, the Committee noted the State Party's recent establishment of the National Guard, a new civilian law enforcement agency to combat organized crime but expressed concern that a military officer has been appointed as the new agency's chief of operations.[8]

12. Many of The Advocates' clients have experienced violence perpetrated by members of organized criminal gangs.[9] Credible secondary sources confirm that the problem of violence perpetrated by organized crime is compounded by lack of accountability for its members. Criminal gangs are "at times in league with corrupt state, local, and security officials,"[10] resulting in "extremely low rates of prosecution for all forms of crimes."[11] Criminal justice officials also face significant pressure against the pursuit of justice on behalf of victims of human rights abuses.[12]

13. Another client of The Advocates reported that police working in conjunction with a local cartel kidnapped and tortured him.[13] A community member believed to be working with the cartel reported the client to police, falsely accusing him of stealing his vehicle. Police arrested the client the following day and beat him. Cartel members arrived and continued to beat the client as well as stab him in the leg, telling him that this treatment was the result of the client's promotion of anti-cartel ideals.[14]

14. Despite the establishment of the National Guard, organized crime and violence continue. In March and April 2020, about a year after the establishment of the National Guard, the second- and third-highest monthly homicide rates were recorded in Mexico.[15]

15. **Suggested questions relating to impunity for organized criminal gangs:**

   • What steps has the government of Mexico taken toward enacting laws to effectively guarantee the independence, autonomy, and professionalism of the Office of Attorney

---

[8] Committee Against Torture, Concluding observations on the seventh periodic report of Mexico, (24 July 2019), U.N. Doc. CAT/C/MEX/CO/7 ¶30.

[9] Interviews conducted by The Advocates (2020-2021).

[10] U.S. Department of State, *Country Reports on Human Rights Practices for 2016: Mexico* (Washington, D.C.: Bureau of Democracy, Human Rights, and Labor, Apr. 7, 2017), 3. Also available at https://www.state.gov/documents/organization/265812.pdf.

[11] U.S. Department of State, *Country Reports on Human Rights Practices for 2016: Mexico* (Washington, D.C.: Bureau of Democracy, Human Rights, and Labor, Apr. 7, 2017), 3. Also available at https://www.state.gov/documents/organization/265812.pdf.

[12] Justice in Mexico, *2016 Justiciabarómetro—Perspectives on Mexico's Criminal Justice System: What Do Its Operators Think?*, by Nancy G. Cortés, Octavio Rodríguez Ferreira, and David A. Shirk (San Diego, CA: University of San Diego, 2017), 17. Also available at https://justiceinmexico.org/wp-content/uploads/2017/03/2016-Justiciabarometro_English-Version_Online.pdf.

[13] Interviews conducted by The Advocates (2020-2021).

[14] Interviews conducted by The Advocates (2020-2021).

[15] The Washington Office on Latin America, One Year After National Guard's Creation, Mexico is Far from Demilitarizing Public Security, January 14, 2022, https://www.wola.org/analysis/one-year-national-guard-mexico/.

General, including internal oversight bodies and accountability processes, as recommended by the Office of the High Commissioner for Human Rights?

- What oversight and accountability mechanisms are provided for in the law to combat impunity of Mexico's state and municipal police forces?

- What steps has the government of Mexico taken to implement the UN High Commissioner's recommendation to create a national advisory council to combat impunity?

**III.    The State Party fails to protect women from acts of violence, harassment, and abuse.**

16. In its July 2019 Concluding Observations, the Committee expressed concern about the large number of femicides recorded between January 2015 and February 2019 alone, as well as the poor implementation of relevant legal frameworks, ultimately resulting in impunity.[16]

17. In 2007, the Mexican Congress established a comprehensive state and federal framework "to ensure the right of women to live free from violence and discrimination."[17] The 2007 law specifically addresses femicide, and also protects against physical and sexual violence, and "violence against the woman's dignity, integrity or freedom."[18] This law has not been fully implemented across Mexico, and some legal mechanisms have proven ineffective[19] with inadequate protection for women and girls against domestic and sexual violence.[20]

---

[16] Committee Against Torture, *Concluding observations on the seventh periodic report of Mexico*, (24 July 2019), U.N. Doc. CAT/C/MEX/CO/7, ¶16.

[17] Católicas por el Derecho a Decidir (CDD) and Comisión Mexicana de Defensa y Promoción de los Derechos Humanos (CMDPDH), *Femicide and Impunity in Mexico: A context of structural and generalized violence*, Jul. 17, 2012. Also available at https://www2.ohchr.org/english/bodies/cedaw/docs/ngos/CDDandCMDPDH_forthesession_Mexico_CEDAW52.pdf.

[18] Research Directorate, Immigration and Refugee Board of Canada, *Mexico: Adoption of the General Law on Women's Access to a Life Free of Violence (Ley General de Accesso de las Mujeres a una Vida Libre de Violencia), its implementation regulations, and local implementation laws in the Federal District and the states of Mexico, Jalisco and Querétaro* (Ottawa, ON: Immigration and Refugee Board of Canada, 12 June 2008), accessed 16 March 2018, http://www.refworld.org/docid/48a3028817.html.

[19] For example, the "Alerts of gender-based violence against women" which are now active in 12 states, have not reduced gender-based violence against women and girls. Amnesty International, *Amnesty International Report 2017/2018: The State of the World's Human Rights* (London, U.K.: Amnesty International Ltd., 2018), 260. Also available at https://www.amnesty.org/download/Documents/POL1067002018ENGLISH.PDF.

[20] Human Rights Watch, *Country Summary: Mexico*, (New York, N.Y.: Human Rights Watch, January 2017), 6. Also available at https://www.hrw.org/sites/default/files/mexico_1.pdf. For example, some legal provisions in Mexico "make the severity of punishments for some sexual offenses contingent upon the 'chastity' of the victim". Id.

18. Violence against women remains a major concern in Mexico.[21] In 2020, 3,723 Mexican women were victims of homicide.[22] Two-thirds of women have experienced some form of violence with almost 44% suffering abuse from a partner.[23] The government inadequately investigates most cases of gender-based violence, with perpetrators enjoying impunity.[24]

19. Further, thirteen states in Mexico consider the chastity of a woman in characterizing or punishing sexual violence.[25] It has also been reported that law enforcement officers frequently do not issue protection or restraining orders though it is an available remedy to victims of domestic violence.[26] Such policies and practices lead to fewer convictions, lighter sentences in cases of convictions, and prevent victims from accessing remedies.

20. **Suggested questions relating to violence against women:**

- What steps has the government of Mexico taken to amend the Criminal Code so the severity of punishments for sexual offenses is never contingent upon the "chastity" of the victim?

- What oversight bodies and accountability processes are in place to ensure the full implementation of the General Law on Women's Access to a Life Free of Violence?

- What training do members of the law enforcement and judiciary receive on the dynamics of domestic violence and gender-based violence and responding to such incidents?

- To what extent does the government of Mexico involve organizations that serve victims of domestic violence in conducting such trainings?

- What trainings does the government of Mexico provide in relation to the application of legislative norms on restraining orders to ensure consistency of the law enforcement response?

---

[21] Amnesty International, *Amnesty International Report 2017/2018: The State of the World's Human Rights* (London, U.K.: Amnesty International Ltd., 2018), 257. Also available at https://www.amnesty.org/download/Documents/POL1067002018ENGLISH.PDF.

[22] Amnesty International, *Justice on Trial: Failures of Criminal Investigations of Femicides Preceded by Disappearance in the State of Mexico* (United Kingdom, Amnesty International Ltd. 2021), 13. Also available online at https://www.amnestyusa.org/wp-content/uploads/2021/09/Report-English.pdf.

[23] Christine Murray, *Mexico's Emergency Calls on Violence Against Women Spiked in 2020, Global Citizen*, January 27, 2021. https://www.globalcitizen.org/en/content/mexico-violence-women-emergency-calls/#:~:text=Surveys%20by%20national%20statistics%20agency,suffering%20abuse%20from%20a%20partner.

[24] Amnesty International, *Amnesty International Report 2017/2018: The State of the World's Human Rights* (London, U.K.: Amnesty International Ltd., 2018), 260. Also available at https://www.amnesty.org/download/Documents/POL1067002018ENGLISH.PDF.

[25] Human Rights Watch, *Mexico: The Second Assault Obstructing Access to Legal Abortion after Rape in Mexico*, January 14, 2022, https://www.hrw.org/report/2006/03/06/mexico-second-assault/obstructing-access-legal-abortion-after-rape-mexico

[26] Immigration and Refugee Board of Canada, "Mexico: Domestic violence, including legislation; protection and support services offered to victims by the state and civil society, including Mexico City (2015-July 2017)," January 14, 2022, https://www.refworld.org/docid/59c116e24.html.

IV.    **The State Party fails to protect LGBTI individuals from acts of violence, harassment, abuse, and discrimination based on their sexual orientation.**

21. Same-sex marriage has been legal in Mexico City since 2010, and 32 states have legalized it.[27] In May 2016, however, the national Congress vetoed a bill introduced by President Peña Nieto that would "legalize same-sex marriage, to remove sexual orientation and gender identity as barriers to adoption, and to recognize gender identity through the reissuance of birth notices, without a doctor's involvement."[28]

22. Despite these legal provisions, lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons in Mexico continue to experience discrimination, harassment, and the threat of violence.[29] In 2020 alone, at least 79 LGBTI persons were killed — a rate of about seven per month.[30]

23. Only the Federal District of Mexico City allows transgender persons to legally change their name and gender. In order to change their name and gender, however, they must first undergo gender-affirming surgery.[31] Gender-affirming surgeries are not adequately accessible. Barriers to access lead many transgender persons to use dangerous and self-administered hormones, chemicals, and fillers such as oil injections that may cause long-term health problems.[32]

24. **Suggested questions relating to acts of violence, harassment, abuse, and discrimination against LGBTI individuals**

- What steps has the government of Mexico taken to amend the Criminal Codes of all Mexican states so that crimes committed based on the victim's sexual orientation or gender identity are considered hate crimes?

- What steps has the government of Mexico taken toward legalizing same-sex marriage throughout the country?

- What steps has the government of Mexico taken toward recognizing gender identity through the reissuance of birth notices, without a doctor's involvement?

---

[27] Dave Graham, *Mexican state of Sonora approves same-sex marriage*, Reuters, September 24, 2021, https://www.reuters.com/world/americas/mexican-state-sonora-approves-same-sex-marriage-2021-09-24/.

[28] Alexandra Alper, *Mexican congressional committee rejects Pena Nieto's bid to legalize gay marriage*, Reuters, November 10, 2016,  https://www.reuters.com/article/us-mexico-gaymarriage-idUSKBN1350DJ

[29] U.S. Department of State, *Country Reports on Human Rights Practices for 2016: Mexico* (Washington, D.C.: Bureau of Democracy, Human Rights, and Labor, Apr. 7, 2017), 3. Also available at https://www.state.gov/documents/organization/265812.pdf.

[30] Albinson Linares, Noticias Telemundo, *'We are invisible': Discrimination and risks multiply for Indigenous LGBTQ in Mexico*, NBC News, June 30, 2021, https://www.nbcnews.com/news/latino/-are-invisible-discrimination-risks-abound-indigenous-lgbtq-mexico-rcna982.

[31] The International Lesbian, Gay, Bisexual, Trans and Intersex Association, *Trans Legal Mapping Report: Recognition before the law,* by Zam Chiam, Sandra Duffy, Matilda Gonzalez Gil (Geneva: ILGA November 2016). Also available online athttps://ilga.org/downloads/TLMR_ENG.pdf.

[32] Mayela Sanchez, *Transgender People in Mexico City Resort to Dangerous Unsupervised Procedures*, Global Press Journal, December 18, 2016, https://globalpressjournal.com/americas/mexico/transgender-people-mexico-city-resort-dangerous-unsupervised-procedures/.

- What steps has the government of Mexico taken toward allowing transgender people to change legally change their name and gender, without imposing restrictions such as requirements to undergo gender-affirming surgery?

- What steps have been taken to train federal, state, and municipal law enforcement on international standards and best practices for treating LGBTI individuals and preventing violence against them?

# EXHIBIT D
## To Austin Decl.

United Nations



**General Assembly**

A/HRC/56/9

Distr.: General
2 April 2024

Original: English

**Human Rights Council**
**Fifty-sixth session**
18 June–12 July 2024
Agenda item 6
**Universal periodic review**

## Report of the Working Group on the Universal Periodic Review*

## Mexico

---

\*   The annex is being circulated without formal editing, in the languages of submission only.

GE.24-04224  (E)    280324   020424

Please recycle 

## Introduction

1.     The Working Group on the Universal Periodic Review, established in accordance with Human Rights Council resolution 5/1, held its forty-fifth session from 22 January to 2 February 2024. The review of Mexico was held at the 6th meeting, on 24 January 2024. The delegation of Mexico was headed by the Undersecretary for Multilateral Affairs and Human Rights, Ministry of Foreign Affairs, Ambassador Joel Antonio Hernández García. At its 16th meeting, held on 31 January 2024, the Working Group adopted the report on Mexico.

2.     On 10 January 2024, the Human Rights Council selected the following group of rapporteurs (troika) to facilitate the review of Mexico: Bulgaria, China and Paraguay.

3.     In accordance with paragraph 15 of the annex to Human Rights Council resolution 5/1 and paragraph 5 of the annex to Council resolution 16/21, the following documents were issued for the review of Mexico:

        (a)     A national report submitted/written presentation made in accordance with paragraph 15 (a);[1]

        (b)     A compilation prepared by the Office of the United Nations High Commissioner for Human Rights (OHCHR) in accordance with paragraph 15 (b);[2]

        (c)     A summary prepared by OHCHR in accordance with paragraph 15 (c).[3]

4.     A list of questions prepared in advance by Angola, Austria, Belgium, Canada, Germany, Liechtenstein, Portugal, on behalf of the Group of Friends on national mechanisms for implementation, reporting and follow-up, Slovenia, Spain, Sweden, the United Kingdom of Great Britain and Northern Ireland and the United States of America was transmitted to Mexico through the troika. These questions are available on the website of the universal periodic review.

## I.    Summary of the proceedings of the review process

### A.    Presentation by the State under review

5.     The delegation reaffirmed the commitment of Mexico to its international human rights obligations and its openness to international cooperation, dialogue and scrutiny. Mexico had ratified eight international human rights treaties during the period under review and was up to date in complying with its reporting obligations pursuant to the international human rights instruments to which it was a party.

6.     The delegation noted that Mexico had issued a standing invitation to the special procedure mandate holders of the Human Rights Council. In the period under review, Mexico had received seven visits from heads of human rights organizations and special procedure mandate holders, both from the international and from the inter-American human rights systems. Linkages with the international human rights system had strengthened national institutions, the rule of law and democracy in the country. The 2011 constitutional reform in the field of human rights had been fundamental to the integration of international human rights law into national legislation.

7.     The current Government had prioritized the rights of people in vulnerable situations, following its principle "For the good of all, the poor come first". The social and human rights policy of Mexico in the period under review had proved effective in the fight against poverty, addressing the structural causes of inequality, discrimination and violence.

8.     The 2020–2024 National Human Rights Programme focused on economic, social and cultural rights as the basis for the development and consolidation of a state of peace and well-being. As a result of investment in social programmes, poverty was being reduced and

---

[1]    A/HRC/WG.6/45/MEX/1.
[2]    A/HRC/WG.6/45/MEX/2.
[3]    A/HRC/WG.6/45/MEX/3.

the security situation was improving. Between 2018 and 2022, the percentage of the population of Mexico living in multidimensional poverty had fallen from 41.9 to 36.3 per cent, lifting 5.1 million people out of poverty. Likewise, Mexico had promoted a new minimum wage policy, aiming to right a historic wrong by ensuring a decent wage for workers who earned the least. From 2019 to 2024, the minimum daily wage in Mexico had increased by almost 120 per cent, benefiting 8.9 million formal workers. The unemployment rate in Mexico was 3 per cent, the lowest in the region. In parallel, the "Young Persons Building the Future" programme provided young people in Mexico with the tools necessary to improve their prospects and train for a profession or trade. From January 2019 to June 2023, more than 2.5 million young people had benefited from training in over 450,000 workplaces.

9.      The delegation underscored the fact that its minimum wage policy had not only facilitated the establishment of a minimum welfare floor, which had lifted workers out of poverty, but had also contributed to reducing the gender pay gap, which had decreased by 20 per cent at the municipal level. The 2020–2024 National Programme for Equality between Women and Men had promoted women's inclusion, without discrimination, in the labour market and their right to equal pay.

10.     The delegation reported that, between 2018 and 2022, the percentage of persons deprived of housing of adequate quality and size had decreased from 11 to 9.1 per cent, and the percentage of persons deprived of access to basic services in housing had decreased from 19.6 to 17.8 per cent. During the same period, the percentage of persons deprived of access to nutritious, good-quality food had decreased from 22.2 to 18.2 per cent, ensuring that an additional 4 million people enjoyed the right to food.

11.     The delegation highlighted the fact that, from September 2022 to June 2023, under the auspices of the National Strategy for Inclusive Education, 10.5 million students had been given scholarships, distributed equally among the three levels of education. Some 2.4 million of those scholarships had been awarded to Indigenous children. In addition, free public health services had been strengthened in Mexico. Between 2018 and 2022, of the 49 million people who had requested medical attention, 99.6 per cent – 48.8 million Mexicans – had received treatment, resulting in a decrease of 6.8 per cent in family expenditure on health.

12.     During the period under review, strategies had been implemented aimed at preventing crime and violence, focusing on root causes, coordination at the three levels of government and public participation. As a result, between 2018 and 2022, crime levels had dropped from 33 to 26.8 per cent at the national level. Mexico had 130 million inhabitants and a federal system that consisted of 32 federal entities and 2,475 municipalities, in which the three branches of government, autonomous constitutional bodies and the three levels of government –federal, state and municipal – converged, with concurrent responsibilities, but also exclusive functions.

13.     The delegation said that the institutional, demographic and social context at the national level must be taken into account when analysing the human rights situation in the country. It recognized that, despite the significant progress it had made and its robust human rights agenda, Mexico needed to pursue efforts on issues such as enforced disappearance, protection of journalists and human rights defenders, persistent gender gaps, all forms of violence against women and girls, and the human rights situation of migrants.

14.     The delegation reiterated the full commitment of Mexico to the fundamental values of democracy, recognizing that human rights, the rule of law and democracy were mutually reinforcing.

## B.   Interactive dialogue and responses by the State under review

15.     During the interactive dialogue, 115 delegations made statements. Recommendations made during the dialogue are to be found in section II of the present report.

16.     Tunisia, Türkiye, Uganda, Ukraine, the United Kingdom of Great Britain and Northern Ireland, the United States of America, Uruguay, the Bolivarian Republic of Venezuela, Viet Nam, Algeria, Argentina, Armenia, Australia, Austria, Azerbaijan, the

Bahamas, Bahrain, Bangladesh, Belgium, the Plurinational State of Bolivia, Botswana, Brazil, Bulgaria, Burkina Faso, Burundi, Cambodia, Cameroon, Canada, Cabo Verde, Chile, China, Colombia, the Congo, Costa Rica, Croatia, Cuba, Cyprus, Czechia, Denmark, Djibouti, the Dominican Republic, Ecuador, Egypt, El Salvador, Estonia, Finland, France, the Gambia, Georgia, Germany, Ghana, Greece, Honduras, Iceland, India, Indonesia, the Islamic Republic of Iran, Iraq, Ireland, Israel, Italy, Japan, Jordan, Kazakhstan, Kenya, Kyrgyzstan, Kuwait, the Lao People's Democratic Republic, Lebanon, Lesotho, Libya, Lithuania, Luxembourg, Madagascar, Malawi, Malaysia, Maldives, the Marshall Islands, Mauritius, Mongolia, Montenegro, Morocco, Nepal, the Kingdom of the Netherlands, New Zealand, the Niger, Nigeria, Norway, Pakistan, Panama, Paraguay, Peru, the Philippines, Poland, Portugal, Qatar, the Republic of Korea, Romania, the Russian Federation, Samoa, Saudi Arabia, Serbia, Sierra Leone, Slovakia, Slovenia, Spain, Sri Lanka, the State of Palestine, Sweden, Switzerland, the Syrian Arab Republic, Thailand, Timor-Leste, Togo and Trinidad and Tobago made statements. The complete version of the statements can be found in the webcast archived on the website of the United Nations.[4]

17.    After the interventions of 38 States, the delegation indicated that Mexico maintained ongoing dialogue with the Committee on Enforced Disappearances and was committed to implementing and following up on its recommendations. Mexico had opted for a model of broad institutional coordination among search commissions, prosecutors' offices, the police and other authorities at both the federal and the state levels. The budget allocated to the National Search Commission had increased by almost 270 per cent, from more than 400 million pesos ($23 million) in 2019 to more than 1 billion pesos ($58 billion) in 2023. Between 2019 and 2023, the National Search Commission had granted more than 800 million pesos to the 32 state search commissions to enable them to conduct searches and to strengthen their forensic capabilities.

18.    The delegation clarified that the National Register of Missing and Disappeared Persons was maintained by the National Search Commission, which compiled, organized and cross-checked information to be used to locate people for whom the authorities had been asked to initiate a search. The National Strategy for the Generalized Search for Missing Persons, which had been launched in 2023, had to date led to 15 per cent of the 110,964 registered missing persons being found and 16 per cent being located, with individualized searches continuing in those cases. Both the National Missing Persons System and the Executive Commission for Victim Support had been providing victims with advice and support. Since 2018, more than 936 million pesos had been spent on reparations for human rights violations.

19.    The delegation recognized the important work done by human rights defenders and journalists and highlighted the fact that efforts were being made to guarantee that they could carry out their work and activities freely, without fear of reprisals or attacks. Between 2018 and 2022, the budget of the National Protection Mechanism for Human Rights Defenders and Journalists had increased by 175 per cent and, by the end of 2022, its staff had expanded by 70 per cent. The Office of the Special Prosecutor for Crimes against Freedom of Expression, which was attached to the Attorney General's Office, investigated and prosecuted such crimes, which undermined journalists' freedom of expression.

20.    In May 2023, Mexico had submitted its eighth periodic report to the Committee against Torture. In 2023, Mexico had launched its first National Strategy against Torture. It had also taken legislative measures mandating justice institutions to create specialized prosecutors' offices and had issued guidance for judicial officials on international human rights standards relating to due process and fair trial rights.

21.    The delegation emphasized that the budget of the national mechanism for the prevention of torture, which was attached to the National Human Rights Commission, had increased more than 110 per cent, from about 31 million pesos in 2019 to 35 million pesos in 2023. Furthermore, in 2022, an expert committee had been set up with four specialists in the prevention of torture, who would also be able to take part in the national preventive mechanism.

---

[4]  See https://webtv.un.org/en/asset/k1i/k1iwakvpt5.

22.    Following the intervention of a further 47 States, the delegation said that the national policy on equality between women and men promoted non-discrimination, equal opportunities, equal treatment, substantive equality and the full exercise of women's rights and their equal participation in all areas. The delegation highlighted the fact that the creation of a national care system was a top priority in order to ensure that women entered the paid workforce.

23.    The delegation indicated that, between 2017 and 2023, the federal budget allocation to the main specialized support programmes for women victims of violence had increased by 86 per cent, which had translated into an increase of more than 24 per cent in the programmes' support capacities. Following up on a recommendation made by the Committee on the Elimination of Discrimination against Women, a model definition of the criminal offence of femicide had been issued, establishing a basis for legislative harmonization at the national level. In 2023, four federative entities had entirely harmonized the definition of femicide in state-level criminal legislation with the model and another eight had taken initiatives to incorporate elements of that definition.

24.    The delegation indicated that Mexico had renewed its commitment to the safe, orderly, humane and regular management of migration and asylum. One significant development in that area had been the inclusion for the first time, in 2020, of provisions addressing forced internal displacement in the Sectoral Programme of the Ministry of the Interior.

25.    The delegation remarked that all State social programmes included an intercultural perspective. It underscored that, in December 2018, the Government had published the law establishing the National Institute of Indigenous Peoples. In 2019, the National Institute had published a protocol on the right of Indigenous Peoples to consultations concerning free, prior and informed consent. A total of 17 participative planning exercises involving Indigenous Peoples, referred to as regional justice or regional development plans, had been carried out to redress historical grievances or address development.

26.    The National System for the Comprehensive Protection of Children and Adolescents carried out work involving coordination and dialogue, in accordance with the provisions of the Convention on the Rights of the Child. In addition to the National System, 32 state systems and more than 1,800 municipal systems provided comprehensive protection for children and adolescents. Several protocols had been introduced to put an end to violence against children. Child marriage was prohibited throughout the country. In 2021, several legislative instruments had been amended in order to prevent and prohibit corporal and humiliating punishment of children and to ensure respect for their physical, mental and emotional integrity. In Mexico, discrimination on the grounds of sexual orientation, gender identity or expression or sex characteristics was prohibited. In 2020, Mexico had ratified the Inter-American Convention against All Forms of Discrimination and Intolerance, the first regional instrument to include sexual orientation and gender identity and expression as grounds of discrimination, which had consolidated the national regulatory framework.

27.    Each of the 32 states had a specialized legal instrument on the protection of the rights of persons with disabilities, and in 11 states, denial of reasonable accommodation could constitute discrimination. In 2019, the Welfare Allowance Programme for Persons with Permanent Disabilities had been set up, and provided direct, bimonthly financial support.

28.    The delegation stressed that public policy concerning older persons sought to ensure the integrity and dignity of older persons, strengthen their autonomy and ensure their human rights on the basis of equality and non-discrimination. In 2023, Mexico had ratified the Inter-American Convention on Protecting the Human Rights of Older Persons. Between September 2022 and June 2023, the Ministry of Social Welfare had granted allowances to more than 12.1 million persons aged 65 years or over, of whom almost 1 million lived in Indigenous or Afro-Mexican municipalities.

## II.    Conclusions and/or recommendations

29.    **The response of Mexico to the following recommendations will be included in the outcome report adopted by the Human Rights Council at its fifty-sixth session:**

29.1    **Ratify the Optional Protocol to the Convention on the Rights of the Child on a communications procedure (Chile) (Paraguay);**

29.2    **Ratify the Optional Protocol to the Convention on the Rights of the Child on a communications procedure (Cyprus);**

29.3    **Ratify the Optional Protocol to the Convention on the Rights of the Child on a communications procedure (Madagascar);**

29.4    **Ratify the Optional Protocol to the Convention on the Rights of the Child on a communications procedure and the 1961 Convention on the Reduction of Statelessness (Panama);**

29.5    **Ratify the international human rights instruments and optional protocols that it has not ratified (Ukraine);**

29.6    **Consider ratifying the international human rights treaties it has not yet ratified (State of Palestine);**

29.7    **Ratify the Optional Protocol to the International Covenant on Economic, Social and Cultural Rights (Madagascar);**

29.8    **Ratify the Optional Protocol to the International Covenant on Economic, Social and Cultural Rights (Niger);**

29.9    **Sign and ratify the Optional Protocol to the International Covenant on Economic, Social and Cultural Rights (Portugal);**

29.10   **Consider joining the International Convention against the Recruitment, Use, Financing and Training of Mercenaries (Armenia);**

29.11   **Ratify the Convention against Discrimination in Education (Cyprus);**

29.12   **Conduct effective and timely investigations into human rights violations against migrants (Bangladesh);**

29.13   **Conduct thorough and timely investigations into violations of the human rights of migrants by establishing a public protection office and district courts specializing in human mobility issues to monitor the detention of migrants (Kyrgyzstan);**

29.14   **Consider the review of the Migration Act, especially the administrative detention of migrants, ensuring its application as a last resort, for the shortest possible time, in respect for human rights and in full compliance with international standards (Brazil);**

29.15   **Amend the Migration Act to eliminate provisions allowing automatic administrative detention of all persons in a situation of illegal migration (Kyrgyzstan);**

29.16   **Implement the recommendations in the 2022 report of the Committee on Enforced Disappearances and the General Act on Enforced Disappearance, particularly at the level of the federative states (France);**

29.17   **Strengthen institutional frameworks and increase resources towards preventing and solving enforced disappearances (Samoa);**

29.18   **Continue to cooperate with the Committee on Enforced Disappearances and to implement its recommendations, including the adoption of a comprehensive national policy to prevent and eradicate enforced disappearances (Romania);**

29.19   **Work to implement the recommendations of the bodies that monitor implementation of the treaties to which Mexico is a party, in particular the Committee on the Rights of the Child (Saudi Arabia);**

29.20   **Fully implement the General Act on Enforced Disappearance, including by strengthening the National Register of Missing and Disappeared Persons, guaranteeing participation of the victims' families (Germany);**

29.21    Continue to take measures to accord proper and humane treatment to all travellers to Mexico, including migrants (India);

29.22    Continue efforts to uphold the principle of non-refoulement of migrants and respect the Global Compact for Safe, Orderly and Regular Migration (Iraq);

29.23    Take further steps to ensure that the policies to promote and protect the rights of women and girls, migrants and refugee children are implemented (Japan);

29.24    Adopt measures to guarantee and protect the rights of persons in situations of mobility, particularly migrants, refugees and victims of crime (Peru);

29.25    Establish national and transnational mechanisms to ensure access to justice, tracing and exchanging forensic information for the benefit of migrants (Kyrgyzstan);

29.26    Review the legislative frameworks on migration and their implementation mechanisms to close gaps and ensure their full compliance with international law (Syrian Arab Republic);

29.27    Work constructively with countries through multilateral action to reach the best international practices in the field of human rights, and respect the cultural and religious specificities of all countries (Saudi Arabia);

29.28    Adopt and implement a national policy for the prevention and eradication of enforced disappearance (Croatia);

29.29    Pursue the valuable efforts of the executive commission in charge of supporting victims of human rights violations (Lebanon);

29.30    Provide tools and comprehensive training to public servants in the area of human rights (Slovakia);

29.31    Increase the resources, including financial, of the public prosecutors' offices at the federal and state levels of the federation and strengthen inter-institutional coordination in order to combat impunity (Switzerland);

29.32    Strengthen, from an intersectional and gender perspective, the federal Protection Mechanism for Human Rights Defenders and Journalists, specifically in the areas of prevention, protection, investigation, and reparation (Canada);

29.33    Strengthen the national system for monitoring and implementing human rights recommendations, in coordination with the different levels of government (Dominican Republic);

29.34    Continue to strengthen national mechanisms to ensure equality for all and eliminate all forms of discrimination against women, especially in the political space (Uganda);

29.35    Continue its good efforts to fight against discrimination, racism and hate speech (Algeria);

29.36    Step up its efforts to combat discrimination, in particular against vulnerable groups, including persons with disabilities, children and older adults, as well as women, especially those who have faced multiple and intersectional discrimination (Azerbaijan);

29.37    Strengthen national legislation to better combat racial discrimination (Burkina Faso);

29.38    Continue to address social inequalities and ensure comprehensive protection against discrimination faced by women, Afro-Mexican communities, Indigenous Peoples and people living in rural areas (Burundi);

29.39    **Redouble its efforts to prevent and combat all forms of discrimination, particularly against women, children and Indigenous populations (Cameroon);**

29.40    **Guarantee complete protection in order to eradicate all kinds of violence against Afro-Mexican communities, Indigenous communities and those living in remote and rural areas (Congo);**

29.41    **Provide sufficient resources to the National Council for the Prevention of Discrimination to move towards equality and provide an effective response to reports of racial discrimination (Costa Rica);**

29.42    **Take further measures to reduce gender stereotypes and gender inequalities, including by conducting inclusive awareness-raising campaigns on non-discrimination and gender equality (Estonia);**

29.43    **Provide the National Council for the Prevention of Discrimination with the human, financial and technical resources needed to fulfil its mandate effectively (Greece);**

29.44    **Eliminate gender stereotypes (Iceland);**

29.45    **Investigate thoroughly all cases of gender-based violence and ensure redress, including adequate compensation, for gender-based violence survivors (Iceland);**

29.46    **Continue its efforts to combat discrimination faced by women, Indigenous people and other vulnerable sections (India);**

29.47    **Enhance the efforts to address discrimination against women (Kuwait);**

29.48    **Strengthen efforts to eliminate violence against women and to promote gender equality (Lao People's Democratic Republic);**

29.49    **Strengthen public policies and awareness-raising campaigns aimed at combating discrimination and racism (Morocco);**

29.50    **Scale up efforts to combat racism and discrimination in all their forms (Nigeria);**

29.51    **Continue efforts to ensure comprehensive protection against discrimination, especially against vulnerable people (Timor-Leste);**

29.52    **Guarantee comprehensive protection against discrimination against women, Afro-Mexican communities, Indigenous Peoples and people living in rural areas (Togo);**

29.53    **Take measures to ensure the full implementation of legislation and policies addressing enforced disappearance, especially by providing adequate financial resources and establishing institutions specific to this issue (Tunisia);**

29.54    **Continue efforts to conduct thorough and independent investigations into all allegations of enforced disappearance, bring perpetrators to justice and ensure reparations to victims, particularly the families of missing persons (Uruguay);**

29.55    **Strengthen the necessary capacities to undertake prompt, thorough and impartial investigations into enforced disappearances, arbitrary detentions and excessive use of force by State agents (Bolivarian Republic of Venezuela);**

29.56    **Strengthen institutions and policies on enforced disappearances of people, with due follow-up to search actions for disappeared persons and comprehensive support and protection for victims (Bolivarian Republic of Venezuela);**

29.57    **Continue efforts aimed at investigating and punishing cases of enforced disappearances (Argentina); Take further measures to effectively prevent, investigate and punish acts of enforced disappearance (Ukraine);**

29.58    **Implement the recommendations of the United Nations Committee on Enforced Disappearances and continue to strengthen access to truth and justice for victims and their families (Austria);**

29.59    **Implement effectively the national policy on eradication and prevention of enforced disappearances to demonstrate concrete results in terms of the search for missing persons and the conviction of perpetrators (Czechia);**

29.60    **Adopt the legal and administrative measures required to address the crisis of enforced disappearances, including the allocation of sufficient resources and the strengthening of accountability mechanisms (Ecuador);**

29.61    **Continue to conduct investigations into incidents of enforced disappearance and bring perpetrators to justice (Ghana);**

29.62    **Put in place all the measures and instruments foreseen by the General Act on Enforced Disappearance and provide the institutions responsible for the issue with the necessary resources (Luxembourg);**

29.63    **Redouble efforts to investigate cases of missing persons (Peru);**

29.64    **Ensure the full implementation of the General Act on the Prevention of Torture, and empower the national mechanism for the prevention of torture with sufficient financial and human resources to carry out its role (Tunisia);**

29.65    **Take the necessary steps to reinforce the national mechanism for prevention of torture, to investigate and prosecute, and to resourcefully strengthen the independence of the prosecutors' offices to indict perpetrators (Kenya);**

29.66    **Adopt effective policies to reduce homicides and extrajudicial killings (Bahrain); Continue to take measures to curb homicides and extrajudicial killings (India);**

29.67    **Redouble efforts to reduce the homicide rate to a desirable level, while strengthening protection and security mechanisms for people (Cabo Verde);**

29.68    **Ensure effective policies in preventing extrajudicial killings and guarantee civil security (Indonesia);**

29.69    **Ensure violent crimes are investigated in a prompt, thorough and impartial manner to prosecute perpetrators and ensure justice for victims (Ireland);**

29.70    **Adopt policies effective in reducing homicides and extrajudicial killings (Malawi);**

29.71    **Take effective measures to reinforce public security and prevent homicides, in particular femicides and extrajudicial killings (Poland);**

29.72    **Strengthen measures to prevent and combat excessive use of force by law enforcement against citizens (Cabo Verde);**

29.73    **Adopt measures to prevent, investigate and eliminate all forms of excessive use of force and address cases of surveillance of the civilian population by digital means by law enforcement (Costa Rica);**

29.74    **Review the legal and institutional frameworks to prevent the use of excessive or lethal force by law enforcement against civilians (Egypt);**

29.75    **Take further measures to effectively prevent and eliminate all forms of excessive use of force by law enforcement bodies, especially by reviewing the National Act on the Use of Force, on the basis of the International Covenant on Civil and Political Rights (Greece);**

29.76    **Ensure that all complaints of excessive use of force, especially lethal force, by law enforcement and military personnel are promptly and impartially investigated (Malawi);**

29.77    **Investigate cases of excessive use of force by law enforcement officers (Russian Federation);**

29.78    **Repeal the legal concepts of preventive detention without charges (*arraigo*) and informal preventive detention, complying with the standards of the Inter-American Court of Human Rights (Chile);**

29.79    **Complete the process to eliminate the practice of *arraigo* and mandatory pretrial detention (Israel);**

29.80    **Strengthen measures to address the issue of prolonged and arbitrary detentions and ensure due process of the law prevails for those already detained (Lesotho);**

29.81    **Take measures to ensure that preventive detention is carried out in a way that conforms to international human rights standards (Republic of Korea);**

29.82    **Take concrete measures to prevent and reduce the commission of enforced disappearance, mass killings and arbitrary executions, bring perpetrators to justice and remove obstacles faced by victims' families to report cases and obtain reparation (Israel);**

29.83    **Progressively remove military forces from public policing and migration control through a civilian-led transition (New Zealand);**

29.84    **Take effective measures, including at the level of legislation, to combat drug crime (Russian Federation);**

29.85    **Improve the conditions of detention of prisoners in the penitentiary system (Russian Federation);**

29.86    **Establish and implement a comprehensive policy for the prosecution, investigation and prevention of torture (Sierra Leone);**

29.87    **Enhance the institutional framework to pursue the war on drug trafficking (Greece);**

29.88    **Ensure respect for human rights in the fight against organized crime (Spain);**

29.89    **Continue to highlight the effects of illicit firearms trafficking on the enjoyment of human rights (Jordan);**

29.90    **Enhance the efforts to address the illicit trafficking in firearms (Kuwait);**

29.91    **Pursue efforts to ensure public security and eradicate internal security problems, particularly organized crime (Türkiye);**

29.92    **Continue to strengthen public governance to further promote the exercise and realization of human rights (Viet Nam);**

29.93    **Continue adopting measures to combat corruption and impunity (Honduras);**

29.94    **Publish a comprehensive plan to demilitarize the National Guard that includes transferring its control to a civilian authority (United Kingdom of Great Britain and Northern Ireland);**

29.95    **Strengthen the accountability of military institutions to civilian institutions (Marshall Islands);**

29.96    **Ensure that complaints of excessive use of force by law enforcement and military personnel are thoroughly and impartially investigated (Montenegro);**

29.97    **Strengthen the capacity of the prosecutor's office specialized in cases of disappeared persons and redouble efforts to investigate all cases of alleged enforced disappearance (Montenegro); Reinforce the capacity and resources of**

the competent authorities to investigate cases of enforced disappearance and combat impunity (Portugal);

29.98    Ensure the transparency of civilian tasks undertaken by the army by establishing audit and accountability mechanisms consistent with the principles of the rule of law (Switzerland);

29.99    Strengthen policies to prevent criminal impunity (Türkiye);

29.100    Strengthen the capacity and resources of public prosecutors, including those of the Special Prosecutor for Crimes against Freedom of Expression, to investigate crimes against journalists and human rights defenders (United Kingdom of Great Britain and Northern Ireland);

29.101    Implement the police investigation protocol at the state level nationwide to tackle concerning rates of impunity (United Kingdom of Great Britain and Northern Ireland);

29.102    Strengthen journalist protections by improving emergency response, establishing secure channels to report threats and an independent State task force to investigate and prosecute crimes against journalists, supporting the National Protection Mechanism for Human Rights Defenders and Journalists and the Special Prosecutor's Office for Crimes against Freedom of Expression, and holding perpetrators accountable (United States of America);

29.103    Establish external, independent and civilian mechanisms to ensure the accountability of the armed forces (Austria);

29.104    Ensure rapid, thorough, impartial and independent investigations into all cases of enforced disappearance and prosecute those responsible according to international justice standards (Bahrain); Ensure swift, independent and impartial investigations into all cases of enforced disappearance and bring perpetrators to justice (Belgium);

29.105    Ensure the National Register of Missing and Disappeared Persons is accurate, precise, and transparent, to address enforced disappearances and the forensics crisis (Canada);

29.106    Take the necessary and effective measures to eliminate all structural causes of impunity related to homicides, enforced disappearances and violence against women and girls, among other crimes (Cabo Verde);

29.107    Redouble efforts against impunity, through prompt, independent and impartial investigation of violent crimes and offences, as well as guaranteeing comprehensive reparations to victims (Costa Rica);

29.108    Take all useful measures to guarantee the independence of the judiciary, fight against corruption and fight against impunity for perpetrators of extrajudicial arrests and executions (France);

29.109    Continue reforms of its judicial system to enhance its efficiency and independence, and ensure fair trials and the rule of law across the country (Gambia);

29.110    Enhance the State's ability to effectively investigate and sanction human rights violations, including capacity-building and rule of law cooperation with the international community (Germany);

29.111    Develop a comprehensive policy, together with human rights defenders and journalists, to prevent and protect them from violence, including a strategy to reduce impunity (Germany);

29.112    Continue to effectively implement laws to protect human rights defenders and journalists in the country (Ghana);

29.113    Conduct thorough investigations into harassment, persecution and all attempts on the lives of journalists (Greece);

29.114    Define the respective competencies of the Prosecutor General's Office, the federal and state specialized prosecutors' offices and the National Search Commission as regards the investigation of enforced disappearances and coordination for the resolution of cases (Ireland);

29.115    Consider enhancing the investigation of crimes, including acts of violence, against human rights defenders, journalists and other media workers, and ensure justice for those responsible (Lithuania);

29.116    Reinforce the independence of the prosecutors' offices to eradicate impunity, including in cases of disappearance, torture and violations against journalists and human rights defenders (New Zealand);

29.117    Combat enforced disappearances, in particular by coordinating with the Prosecutor General's Office, to secure the operation of the National Forensic Databank and to improve human identification through the matching of fingerprints with the National Electoral Institute (Norway);

29.118    Guarantee budgetary and technical resources so that the General Act on Enforced Disappearance is effective on the ground (Paraguay);

29.119    Take actions to reinforce the full and effective implementation of the General Victims Act and continue to develop a general law on memory (Peru);

29.120    Take effective measures to investigate murders of journalists and human rights activists and cases of enforced disappearance (Russian Federation);

29.121    Improve access to justice for victims of human rights violations and their families by strengthening the autonomy and resources of the federal and local attorney generals' offices (Sweden);

29.122    Increase efforts to guarantee that human rights defenders, journalists, activists and other civil society actors can carry out their activities in a safe and free environment (Uruguay);

29.123    Harmonize its legislation with the international human rights law framework to amend possible restrictions on fundamental freedoms and safeguard the work of journalists in the country (Bolivarian Republic of Venezuela);

29.124    Continue strengthening measures aimed at preventing, investigating and prosecuting attacks and other forms of abuse against journalists and human rights defenders, especially women human rights defenders (Argentina);

29.125    Implement the recommendations of the diagnosis of Mexico's Federal Protection Mechanism by OHCHR, and ensure the Mechanism is adequately resourced (Australia);

29.126    Ensure the effective functioning of the federal Protection Mechanism for journalists and human rights defenders, in particular by implementing OHCHR's recommendations and developing a national strategy for all levels of government to effectively prevent attacks against journalists and human rights defenders and ensure independent investigations (Austria);

29.127    Pursue the implementation of public policies that create a safe and respectful environment for the work of journalists and human rights defenders (Belgium);

29.128    Guarantee fully the right to freedom of opinion and expression by strengthening the Protection Mechanism for journalists and human rights defenders (Czechia);

29.129    Guarantee the investigation of and accountability for the killings of journalists, and prosecution of perpetrators (Egypt);

29.130    **Develop effective public policies to ensure that human rights defenders and journalists are able to carry out their work and activities freely (Estonia);**

29.131    **Implement fully the 2012 law for the protection of human rights defenders and journalists, and implement the recommendations of OHCHR-Mexico regarding strengthening the National Protection Mechanism for Human Rights Defenders and Journalists (Finland);**

29.132    **Ensure the full and equal enjoyment of the right to freedom of religion or belief of all persons, without discrimination of any kind (Gambia);**

29.133    **Ensure impartial investigation of violent attacks against religious leaders and places of worship, and ensure accountability for perpetrators and justice for victims (Islamic Republic of Iran);**

29.134    **Take necessary legislative measures to respect the right to freedom of opinion and expression without fear of reprisals (Islamic Republic of Iran);**

29.135    **Ensure effective protection of journalists and human rights defenders (Italy);**

29.136    **Provide mechanisms to protect human rights defenders and journalists (Marshall Islands);**

29.137    **Take effective measures to ensure that human rights defenders and journalists are able to conduct their work freely and without fear of reprisals or attack (Montenegro);**

29.138    **Take the necessary measures to further strengthen the fundamental freedoms of human rights defenders and journalists (Morocco);**

29.139    **Investigate and sanction those responsible for acts of illegal surveillance of human rights defenders and journalists, including through the use of digital surveillance technologies, in an independent, diligent and exhaustive manner and in full compliance with international standards (Kingdom of the Netherlands);**

29.140    **Guarantee the safety of human rights defenders and journalists by combating impunity for crimes against these groups and by developing effective public policies for prevention and protection (Norway);**

29.141    **Ensure that human rights defenders and journalists are able to carry out their work and activities freely, without fear of reprisals or attacks (Poland);**

29.142    **Strengthen measures to protect journalists and human rights defenders (Portugal);**

29.143    **Step up its efforts to protect journalists, politicians and civil servants from homicide and other crimes (Republic of Korea);**

29.144    **Further develop the national and regional centres for human identification, including increasing staffing and operational capabilities, to ensure effective identification and documentation of missing persons (United States of America);**

29.145    **Ensure that the National Protection Mechanism for Human Rights Defenders and Journalists has sufficient resources to effectively carry out its mandate (Denmark); Strengthen the Protection Mechanism for Human Rights Defenders and Journalists by ensuring the allocation of sufficient financial and human resources (Romania); Support and strengthen the National Protection Mechanism for Human Rights Defenders and Journalists, including its legal and financial framework (Slovakia); Strengthen the National Protection Mechanism for Human Rights Defenders and Journalists by allocating sufficient resources and by coordinating and by auditing its implementation at the level of the states of the Federation (Switzerland);**

29.146    **Strengthen the Protection Mechanism for Human Rights Defenders and Journalists through the effective implementation of the national prevention and protection system (Spain);**

29.147    **Protect religious leaders and communities from violent criminal gangs and drug cartels (Pakistan);**

29.148    **Redouble efforts to eliminate gender stereotypes related to the responsibilities of men and women in care tasks, family and society (Colombia);**

29.149    **Continue efforts to protect the family as the main building block of society (Iraq);**

29.150    **Ensure that relevant laws and policies respect the rights and duties of parents or legal guardians of children, in accordance with international law (Nigeria);**

29.151    **Support and protect the family as the fundamental unit of society and promote the preservation of family values (Pakistan);**

29.152    **Take measures to address the structural causes of child, early and forced marriages and unions through public policies that involve children, adolescents, young people and Indigenous communities in their design, implementation and evaluation (Kazakhstan);**

29.153    **Address the structural factors of child, early and forced marriages and unions through public policies in whose design, implementation and evaluation children, adolescents, young people and Indigenous communities participate (Panama);**

29.154    **Continue efforts to address child, early and forced marriages (Lesotho);**

29.155    **Continue efforts to prevent and combat trafficking in persons, especially through the effective implementation of the General Act on the Prevention, Punishment and Elimination of Trafficking in Persons Offences (Tunisia);**

29.156    **Continue strengthening efforts to combat trafficking in persons within the migrant and asylum-seeking community (Cambodia);**

29.157    **Develop a specific legal framework to effectively combat trafficking in persons and all forms of slavery (Cameroon);**

29.158    **Strengthen the construction of medical and health-care infrastructure to safeguard people's right to life and health (China);**

29.159    **Continue the efforts undertaken and ensure the effective application of the measures adopted to combat trafficking in persons in accordance with the National Programme for the Prevention, Suppression and Elimination of Crimes related to Trafficking in Persons and for the Protection and Care of Victims of Trafficking (2022–2024) (Djibouti); Take further steps to improve coordination on the implementation of a national policy to prevent, eradicate and criminalize human trafficking (Malaysia);**

29.160    **Continue efforts to prevent and combat trafficking in persons and adopt effective mechanisms for the identification and referral of trafficking victims (Indonesia);**

29.161    **Redouble efforts to prevent, combat and punish trafficking in persons and provide care for victims (Iraq);**

29.162    **Continue its efforts to prevent and combat trafficking in human beings (Mongolia);**

29.163    **Redouble efforts towards combating trafficking in persons and offences against children (Nepal);**

29.164    **Intensify awareness-raising campaigns targeted at rural, migrant and Indigenous communities on means of prevention, protection and assistance related to crimes of trafficking in persons (Syrian Arab Republic);**

29.165    **Advance its efforts to prevent and combat trafficking in persons by ensuring effective implementation of related laws and policies, in particular the national programme of 2022–2024, and providing appropriate assistance and protection to victims (Thailand);**

29.166    **Continue efforts to close the gender pay gap (Burkina Faso);**

29.167    **Continue efforts to close the gender pay gap (Burundi);**

29.168    **Take necessary action to remedy the unacceptable pay gap of 16.7 per cent between men and women (Bahrain); Eliminate the gender pay gap between men and women (Nigeria); Step up efforts to eliminate the gender pay gap between men and women in the labour market (Malaysia); Increase its efforts to reduce the gender pay gap (State of Palestine);**

29.169    **Ensure equal pay for work of equal value (Iceland);**

29.170    **Continue with the implementation of the minimum wage policy, including the efforts to continue reducing the gender wage gap at the local level (Serbia);**

29.171    **Fully implement the General Act on Enforced Disappearance by providing adequate resources to the National Search Commission and by prioritizing the fight against impunity (Italy);**

29.172    **Fully implement the General Act on Enforced Disappearance committed by individuals (Jordan);**

29.173    **Amend policies related to combating the international narcotic problem in order to achieve a drug-free society and improve general health (Egypt);**

29.174    **Support social services and provide comprehensive health care, especially for the most vulnerable people in society, within the framework of national strategic plans (Libya);**

29.175    **Coordinate effective strategies to implement a social protection system with a systemic approach that addresses the root causes of poverty and social exclusion (Paraguay);**

29.176    **Continue its efforts to achieve social and economic development, eradicate poverty and achieve comprehensive sustainable development for all (Algeria);**

29.177    **Continue strengthening measures to guarantee the economic, social and cultural rights of its population, including in rural areas (Plurinational State of Bolivia);**

29.178    **Continue improving the quality and standard of living of the population, reducing poverty, and continue implementing government wage and health policy programmes (Cuba);**

29.179    **Continue with the implementation of social programmes and other measures to reduce poverty and marginalization (Honduras);**

29.180    **Pursue efforts aiming at reducing multidimensional poverty and to improve all economic and social rights, especially the rights to education and to decent work (Lebanon);**

29.181    **Continue work relating to social programmes forming part of public policy to safeguard the right to food and the eradication of hunger (Sri Lanka);**

29.182    **Guarantee access to health services and drinking water to people living in extreme poverty (Togo);**

29.183    **Adopt all necessary measures to improve the quality of public health, and increase health-care spending and access to health care (Bangladesh);**

29.184    **Harmonize all criminal codes in the country with the AI 148/2017 ruling of the Supreme Court of Justice, and ensure that reproductive health services in the national system are provided in a manner consistent with Mexico's Technical Guidelines for Safe Abortion Care and World Health Organization recommendations (Canada);**

29.185    **Continue efforts to promote inclusive access to health and education (India);**

29.186    **Bolster efforts to improve access to health-care services, especially reproductive services for women and girls (Lesotho);**

29.187    **Promote a public health and human rights-based approach when participating in international forums to address global drug problems (Maldives);**

29.188    **Accelerate the complete harmonization of the national and the federal legal frameworks with the decisions of the Supreme Court on abortion, including by decriminalizing voluntary abortion in the remaining 20 states (Belgium);**

29.189    **Harmonize legislation at the federal and state levels to fully decriminalize abortion up to 12 weeks (Luxembourg); Harmonize national and state-level legislation and policies to guarantee access to safe and legal abortion (Estonia); Harmonize legislation in line with the Supreme Court's ruling across all states to ensure that everyone can access safe and legal abortion, regardless of place of residence (Denmark);**

29.190    **Support federal states to guarantee effective access to abortion (France);**

29.191    **Continue to secure access to safe abortion for all women by removing the crime of abortion from the federal and state penal codes, in line with the decision of the Supreme Court (Norway);**

29.192    **Take effective measures to ensure equal access to quality education and to reduce school dropout rates, especially within disadvantaged communities (Bahamas);**

29.193    **Develop comprehensive support policies which ensure that children and adolescents remain in school and have access to comprehensive health services (Botswana);**

29.194    **Take further action to bring back students who have left the educational system as a result of the coronavirus disease (COVID-19) pandemic (Bulgaria);**

29.195    **Continue efforts to improve both the quality and accessibility of education for children and adolescents experiencing migration circumstances (Cambodia);**

29.196    **Continue consolidating the positive results achieved in the promotion of the right to equitable, inclusive and comprehensive education (Cuba);**

29.197    **Ensure adolescents' and youth's unimpeded access to sexual and reproductive health information, counselling, education and services (Estonia);**

29.198    **Improve access to inclusive and high-quality education, particularly by targeting girls, minorities and families living in extreme poverty (Indonesia);**

29.199    **Uphold the rights of the child by providing the necessary support for children to remain in school and have access to health services (Japan);**

29.200    **Continue efforts to reform and develop the education sector to include all segments of society, including persons with disabilities (Libya);**

29.201    **Continue efforts to reduce early dropout from schools among children and adolescents (Malaysia);**

29.202    **Consider ratifying the Convention against Discrimination in Education of the United Nations Educational, Scientific and Cultural Organization (Mauritius);**

29.203    **Intensify efforts to develop comprehensive support policies to ensure children and adolescents remain in school and have access to comprehensive health services (Qatar);**

29.204    **Organize campaigns and educational programmes to raise awareness of the importance of cultural heritage in all its diversity (Cyprus);**

29.205    **Ensure that the use of the armed forces for internal security does not impede accountability, transparency and human rights (Türkiye);**

29.206    **Take more effective measures to close all digital divides, including measures to make Internet access more affordable and accessible to Indigenous Peoples (Republic of Korea);**

29.207    **Enhance meaningful participation of affected communities and transparency in human rights and environmental impact assessments prior to the making of decisions (Timor-Leste);**

29.208    **Take further measures to address violence against environmental defenders (Pakistan);**

29.209    **Prevent the degradation of the rainforest, the loss of biodiversity and the expropriation of socially owned lands (Bangladesh);**

29.210    **Continue to push for socioeconomic development with an integrated approach to rural and urban development, and to reduce poverty rates (China);**

29.211    **Accelerate the process of adopting its policy on business and human rights (Mongolia);**

29.212    **Take effective measures to combat trafficking in persons and drug-related crimes and actively participate in relevant international cooperation (China);**

29.213    **Continue its efforts to promote women's rights and gender equality and combating violence against women (Viet Nam);**

29.214    **Continue advancing women's rights, focusing on tackling gender-based violence and femicide and ensuring gender equality in all sectors of society (Gambia);**

29.215    **Continue to actively pursue policies and initiatives towards the comprehensive protection of women, Indigenous Peoples and Afro-Mexican peoples from discrimination (Trinidad and Tobago);**

29.216    **Ensure the full exercise of women's rights and equal participation of women in decision-making positions in the political, social and private spheres, in line with its 2020–2024 National Programme for Equality between Women and Men (Azerbaijan);**

29.217    **Continue efforts for the empowerment of women and girls and their increased participation in political and social life (Bulgaria);**

29.218    **Intensify efforts to eradicate violence against women and girls, particularly enforced disappearances, femicides and sexual violence (Chile);**

29.219    **Ensure that all cases of gender-based violence, including cases of sexual torture, murders and disappearances of women and girls, are thoroughly investigated and that victims receive redress (Croatia);**

29.220    **Enhance the implementation of effective measures aimed at promoting the rights of women and girls and safeguarding them against all forms of violence, particularly in rural and Indigenous areas (Islamic Republic of Iran);**

29.221    **Integrate gender-responsive approaches to combating organized crime to protect women and girls from all acts of gender-based exploitation, abuse and violence, especially the crime of femicide (Philippines);**

29.222    **Continue to strengthen legal frameworks and policies to guarantee women's rights (Timor-Leste);**

29.223    **Continue its efforts to prevent violence against women and girls (Algeria);**

29.224    **Continue to combat violence against women and girls and intensify efforts to reduce rates of gender-based violence against women (Plurinational State of Bolivia);**

29.225    **Continue to combat violence against women and intensify efforts to reduce levels of gender-based violence against women (Dominican Republic);**

29.226    **Continue combating violence against women and intensifying efforts to reduce levels of gender-based violence against women (Maldives);**

29.227    **Continue taking necessary measures to address and eliminate violence against women and girls (Mongolia);**

29.228    **Take necessary measures to eliminate violence against women and remove the gender pay gap in the labour market (Nepal);**

29.229    **Combat violence against women and ensure adequate protective measures (Norway);**

29.230    **Continue its efforts to combat sexual and gender-based violence (Republic of Korea);**

29.231    **Enact and enforce laws to reduce the incidence of violence against women and girls (Sierra Leone);**

29.232    **Increase efforts to prevent gender-based violence and guarantee access to justice and reparation for victims (Argentina);**

29.233    **Conduct training programmes and awareness-raising campaigns aimed at eliminating gender-based violence against women (Azerbaijan);**

29.234    **Take concrete steps in order to improve the implementation of existing measures aimed at protecting women from any form of gender-based violence and at convicting perpetrators (Czechia);**

29.235    **Adopt all necessary measures to effectively combat violence against women and girls, with particular emphasis on the prosecution of perpetrators of sexual torture, murders and disappearances of women and girls (Djibouti);**

29.236    **Continue implementing public actions and policies to prevent and combat gender-based violence, particularly that faced by migrants, asylum-seekers and refugees (Ecuador);**

29.237    **Take effective measures to prevent and combat violence against women, feminicide and disappearances and to end impunity and guarantee the full implementation of women's rights (Finland); Join efforts to prevent and eradicate violence against women in all its forms, particularly feminicide, and ensure its adequate investigation and punishment to avoid impunity (Paraguay);**

29.238    **Continue taking decisive measures to end all forms of violence against women and ensure effective redress for victims of gender-based violence (Italy);**

29.239    **Ensure all states adopt investigation protocols for femicide and all cases of gender-based violence (Ireland);**

29.240    **Pursue efforts against all forms of violence against women (Lebanon);**

29.241    **Adopt a national policy to prevent violence against women and ways to eradicate and punish it (Saudi Arabia);**

29.242    **Increase awareness of sexual and gender-based violence and provide support and protection to victims (Slovakia);**

29.243    **Establish effective mechanisms to fight impunity, especially with respect to enforced disappearances, torture and violence against women, promoting adequate investigation, punishment of perpetrators and reparation to victims (Spain);**

29.244    **Ensure accountability for violence against women, including enforced disappearances, trafficking, sexual violence and killings, by integrating a gender perspective into investigations and public policies (Sweden);**

29.245    **Increase the budgets of the specialized prosecutors' office for gender-based crimes, and update and standardize protocols for the investigation of cases of violence against women (Australia);**

29.246    **Strengthen the resources of prosecutors specializing in violence against women (France);**

29.247    **Improve the operations and capacity of women's justice centres and the specialized prosecutor's offices for violence against women (New Zealand);**

29.248    **Continue efforts to eliminate legal and procedural uncertainties in the application of the Gender Violence Alert Mechanism, in particular towards harmonization at the federal level (Austria);**

29.249    **Ensure that the Gender Violence Alert Mechanism is adequately resourced and monitored so it is effective in achieving its objectives (Bahamas);**

29.250    **Step up efforts to combat all forms of gender-based violence against women, including femicide (Cyprus);**

29.251    **Intensify efforts to prevent femicide through complete legislative harmonization across all states (Iceland);**

29.252    **Eliminate violence against women and girls, in particular, the disappearances of women and girls, by addressing the root causes (Bangladesh);**

29.253    **Continue strengthening national policies and programmes aimed at combating and preventing violence against women (Georgia);**

29.254    **Adopt a citizen security approach focused on prevention, community coexistence and human rights, paying special attention to the protection of women, marginalized groups and the best interests of the child (Panama);**

29.255    **Allocate resources to ensure women victims of violence have access to specialized assistance and services, including mental health support, affordable housing, childcare, legal aid and job opportunities (Sri Lanka);**

29.256    **Allocate sufficient human, technical and financial resources for the effective and consistent implementation of the Comprehensive Programme for Prevention, Support, Punishment and the Elimination of Violence against Women and victim support (Syrian Arab Republic);**

29.257    **Increase funding for mechanisms for the protection of women's and children's rights (Burkina Faso);**

29.258    **Strengthen mechanisms to protect children from all forms of discrimination and violence, including armed violence (Lithuania);**

29.259    **Strengthen measures to prevent and combat the crimes of sale of children and their sexual exploitation, especially on the Internet and in the tourism and travel sector (Syrian Arab Republic);**

29.260    **Adopt comprehensive policies to combat violence against children (Ghana);**

29.261    **Prevent and punish the recruitment of children by criminal groups, protect them from sexual exploitation, and implement the Additional Protocol for the Search for Children and Adolescents (Italy);**

29.262    **Redouble its efforts to make progress in preventing and punishing offences against children and adolescents, such as online sexual exploitation, corporal punishment and the use of humiliating treatment as a punishment (Poland);**

29.263    **Bolster the fight against the recruitment and use of children and adolescents by criminal groups (Philippines);**

29.264    **Continue promoting measures to ensure the effectiveness of the National Strategy for Early Childhood Care, as well as the strategies for the comprehensive care and protection of children and adolescents for the period 2022–2024 (El Salvador);**

29.265    **Criminalize the recruitment and use of children and adolescents by criminal groups (Israel);**

29.266    **Enhance comprehensive protection of child rights including by considering acceding to the Optional Protocol to the Convention on the Rights of the Child on a communications procedure (Thailand);**

29.267    **Take the necessary legislative, administrative and other measures to ensure full inclusion of persons with disabilities in society (Ukraine);**

29.268    **Adopt a comprehensive strategy for the inclusion of persons with disabilities in society and take expedited measures to end the institutionalization of persons with disabilities (Croatia);**

29.269    **Continue efforts to strengthen policies aimed at promoting the social inclusion and well-being of persons with disabilities, particularly those living in rural areas (Qatar);**

29.270    **Continue with the implementation of programmes for the elimination of discrimination and promotion of the social inclusion of persons with disabilities (Serbia);**

29.271    **Formulate a national strategy which mainstreams persons living with disabilities in broader society and which enhances their ability to live independently (Botswana);**

29.272    **Reinforce measures to ensure the needs of persons with disabilities, providing accessible and inclusive education, health care, housing, employment and information (Lithuania);**

29.273    **Harmonize the national legal framework with the Convention on the Rights of Persons with Disabilities, in order to implement strategies that favour non-institutionalization and the full autonomy of persons with disabilities (Costa Rica);**

29.274    **Continue the implementation of national policy and programmes to promote and protect the rights of persons with disabilities (Lao People's Democratic Republic);**

29.275    **Continue efforts to enhance the rights of vulnerable groups, particularly women, children and persons with disabilities (Georgia);**

29.276    **Guarantee that Indigenous Peoples are consulted meaningfully in decision-making processes, in a horizontal and intercultural manner, before adopting and implementing measures that may affect them (Canada);**

29.277    **Strengthen the necessary measures to guarantee that human rights defenders, including leaders and defenders of Indigenous Peoples,**

Afro-Mexicans and migrants, can carry out their work without fear of reprisals or aggression (Colombia);

29.278    **Intensify efforts to combat structural discrimination against Indigenous Peoples (Colombia); Continue its efforts to combat discrimination against Indigenous Peoples and ensure that the national programme for Indigenous Peoples and other policies with similar aims are implemented (State of Palestine);**

29.279    **Continue strengthening the legislative and institutional framework to combat discrimination against Indigenous Peoples and people of African descent (Dominican Republic); Continue strengthening the legislative and institutional framework to combat discrimination against Indigenous Peoples and the Afro-descendent population (Plurinational State of Bolivia);**

29.280    **Guarantee the full participation of Indigenous Peoples and Afro-Mexicans in the design and implementation of public policies, and implement actions to avoid institutional and structural discrimination (Ecuador);**

29.281    **Strengthen mechanisms to ensure that the right of Indigenous Peoples to free, prior and informed consultation is respected and implemented at all levels of government planning and development processes (Kazakhstan); Continue holding prior consultations with Indigenous communities as a fundamental tool to achieve the full and effective exercise of their rights (Peru);**

29.282    **Ensure comprehensive protection of Indigenous Peoples and Afro-Mexican women living in rural areas, through integration into the national programmes (Kenya);**

29.283    **Strengthen legislative and institutional frameworks to eliminate discrimination against Indigenous Peoples (Kuwait);**

29.284    **Strengthen protection mechanisms for human rights defenders and Indigenous Peoples and investigate all attacks on life, persecutions and reprisals against them, in particular the enforced disappearance of Ricardo Lagunes Gasca and Antonio Díaz Valencia (Luxembourg);**

29.285    **Create a clear policy outlining the process of consultation with Indigenous communities before initiating environmentally harmful extractive projects (Marshall Islands);**

29.286    **Effectively fulfil the rights of Indigenous Peoples to consultation and to free, prior and informed consent (New Zealand);**

29.287    **Ensure the effective operationalization of the protocol on the right to free, prior and informed consultation for Indigenous and Afro-Mexican peoples in the conduct of development projects (Philippines);**

29.288    **Ensure that consultations and decision-making processes pertaining to the development of Indigenous land and territories are fully inclusive and have the meaningful participation of Indigenous Peoples (Samoa);**

29.289    **Develop and strengthen programmes to address human rights inequalities faced by Indigenous communities and Afrodescendants (Sierra Leone);**

29.290    **Ensure that the National Council for the Prevention of Discrimination is adequately resourced to fulfil its mandate, with a view to addressing exclusion and social inequality, including among Indigenous and Afro-Mexican communities (Bahamas);**

29.291    **Strengthen laws and policies to combat stigma and discrimination against Indigenous Peoples and Afro-Mexican communities, including measures to raise their awareness and participation in public policies, and accountability and reparation mechanisms (Brazil);**

29.292    **Redouble efforts to ensure the full enjoyment of human rights by people of African descent (Nigeria);**

29.293    **Take effective measures to counter incidents of missing persons and disappearances, including enforced disappearances, especially among women and girls and Indigenous persons (Pakistan);**

29.294    **Protect LGBTQI+ persons by enforcing stricter penalties for bias-motivated crimes, passing anti-conversion therapy legislation, and establishing specialized support systems, especially for mental health and suicide prevention (United States of America);**

29.295    **Ensure that there are expeditious procedures for the recognition of gender identity in all states of the country (Chile);**

29.296    **Mainstream the rights of persons of diverse sexual orientation, gender identity and expression and sex characteristics by transforming research and care protocols into enforceable laws (Iceland);**

29.297    **Ban conversion therapies (Iceland);**

29.298    **Ban medically unnecessary surgeries on intersex children (Iceland);**

29.299    **Design and implement campaigns to raise awareness in the education community on discrimination against and bullying and cyberbullying of lesbian, gay, bisexual, transgender and intersex persons (Israel);**

29.300    **Implement an inter-institutional strategy to implement all recommendations of the United Nations Committee on Enforced Disappearances with meaningful participation of victims, including special monitoring of disappeared LGBTQI+ persons (Kingdom of the Netherlands);**

29.301    **Systematically investigate crimes and discrimination perpetrated due to the victim's sexual orientation or gender identity, fight impunity as well as prosecute and punish the perpetrators of such violence appropriately in order to further protect LGBTIQ+ persons (Slovenia);**

29.302    **Strengthen efforts and continue to implement concrete measures to prevent and address violence and discrimination against lesbian, gay, bisexual, transgender and intersex persons (Thailand);**

29.303    **Continue its efforts to implement policies to effectively guarantee the rights of migrants, asylum-seekers, refugees and internally displaced persons (Ukraine);**

29.304    **Continue implementing actions for the effective protection of the rights of migrants, refugees, asylum-seekers and stateless persons, particularly in relation to minors (Uruguay);**

29.305    **Strengthen national efforts in public security, including action plans for the migrant population in transit (El Salvador);**

29.306    **Continue enhancing programmes for the regularization of migrants and national efforts to locate missing migrants (El Salvador);**

29.307    **Aim for more coordinated efforts towards an inter-institutional strategy for improving the handling of human mobility and migration (Kuwait);**

29.308    **Improve the asylum system and support a human rights-based approach to migration governance, in line with international standards (Slovakia);**

29.309    **Address the allegation of racially discriminatory treatment at immigration checkpoints (Bangladesh);**

29.310    **Conduct timely investigations into human rights violations against migrants and take steps to eradicate racism, xenophobia, discrimination and**

classism against refugees and migrants by creating specific programmes and through social inclusion and activities aimed at peaceful coexistence (Sri Lanka);

29.311    Continue to put in place measures and policies to protect the rights of asylum-seekers, especially those of African descent (Uganda);

29.312    Take the necessary measures so that all allegations of human rights violations committed against migrants, refugees and asylum-seekers are investigated promptly and impartially (Colombia);

29.313    Strengthen measures aimed at preventing and investigating cases of violence against migrant, asylum-seeking, refugee and internally displaced women and girls (Honduras);

29.314    Implement programmes aimed at prevention, risk mitigation and response to gender-based violence faced especially by migrants, asylum-seekers, refugees and internally displaced persons (Romania);

29.315    Adopt and implement the law on forced internal displacement, together with an effective prevention strategy (Germany);

29.316    Continue efforts to achieve an effective national search system for missing persons, guaranteeing its application through the coordination of all competent institutions (Spain);

29.317    Adopt a national policy for the prevention and eradication of enforced disappearances, as recommended by the Committee on Enforced Disappearances (Sweden);

29.318    Intensify efforts to combat enforced disappearances and the forensic crisis by strengthening coordination with the Attorney General's Office, by ensuring the proper functioning of the National Forensic Databank and by establishing harmonized protocols for exchanging information, particularly on fingerprints, between institutions at the federal level and the states of the Federation (Switzerland).

30.    All conclusions and/or recommendations contained in the present report reflect the position of the submitting State(s) and/or the State under review. They should not be construed as endorsed by the Working Group as a whole.

## Annex

### Composition of the delegation

The delegation of Mexico was headed by H.E. Ambassador Mr. Joel Antonio Hernández García, Undersecretary of Multilateral Affairs and Human Rights, Ministry of Foreign Affairs, and composed of the following members:

- Embajadora Francisca E. MÉNDEZ ESCOBAR, Jefa Alterna de Delegación, Representante Permanente, Misión Permanente de México ante la Oficina de las Naciones Unidas y otros organismos internacionales con sede en Ginebra;

- Sra. Yadhira Yvette TAMAYO HERRERA, Presidenta de la Comisión de Derechos Humanos de la Cámara de Senadores, Senado de la República;

- Sr. Raúl de Jesús ELENES ANGULO, Senador, Senado de la República;

- Sra. Nestora SALGADO GARCÍA, Senadora, Senado de la República;

- Consejero Roberto Armando DE LEÓN HUERTA, Director General de Derechos Humanos y Democracia, Secretaría de Relaciones Exteriores;

- Embajador Fernando Israel ESPINOSA OLIVERA, Representante Permanente Alterno, Misión Permanente de México ante la Oficina de las Naciones Unidas y otros organismos internacionales con sede en Ginebra;

- Sra. Alondra Lisette MENDOZA CARLOS, Segunda Secretaria, Misión Permanente de México ante la Oficina de las Naciones Unidas y otros organismos internacionales con sede en Ginebra;

- Sra. Carmen Montserrat ROVALO OTERO, Tercera Secretaria, Misión Permanente de México ante la Oficina de las Naciones Unidas y otros organismos internacionales con sede en Ginebra;

- Sr. Omar Alfredo BIELMA VELÁZQUEZ, Tercer Secretario, Misión Permanente de México ante la Oficina de las Naciones Unidas y otros organismos internacionales con sede en Ginebra;

- Sra. Zahira Montsserrat MIRANDA AGUILAR, Asesora, Misión Permanente de México ante la Oficina de las Naciones Unidas y otros organismos internacionales con sede en Ginebra;

- Sra. María Astrid REYES CARRERAS, Asesora, Misión Permanente de México ante la Oficina de las Naciones Unidas y otros organismos internacionales con sede en Ginebra.

---

# EXHIBIT E
## To Austin Decl.

# Rise in anti-LGBTQ hate and extremism captured in new reports

The reports cited the increase in anti-LGBTQ rhetoric for the growing extremism.

By **Kiara Alfonseca**
June 22, 2023, 2:35 PM





4:42

**Club Q shooting survivor remembers partner**
GMA Digital shares the story of drag performer Wyatt Kent who lost his boyfriend du...                    **Show More**

Two newly released reports capture the growing anti-LGBTQ+ extremism across the U.S., that has led to protests, threats and violence against the queer community.

A new report from the Institute for Strategic Dialogue has found significantly more incidents of anti-drag protests, threats, and violence than previously reported, with the report adding that anti-drag efforts are accelerating amid growing anti-LGBTQ+ sentiment from conservative politicians.

Another report from the Anti-Defamation League and the LGBTQ+ organization GLAAD shows there have been more than 350 incidents of harassment, vandalism or assault from June 2022 to April 2023, which the report states coincide with an increase in rhetoric and legislation targeting the LGBTQ+ community.

Advocates warn of the dangers that they say lie in growing anti-LGBTQ+ extremist activity.

"Extremists, including elected officials, must be held accountable for inciting violence and using vile rhetoric against marginalized people who just want to live in safety and peace," said GLAAD President and CEO Sarah Kate Ellis. "Targeting people for who they are, or for their race and faith, is an attack on fundamental freedoms, and the health and well-being of all in our country."





Jason Carter in drag as Monica Moore, 22, hosts a drag story hour for families and childr...      **Show more**
Joseph Prezioso/AFP via Getty Images, FILE

## Anti-drag extremism

From June 2022 to May 2023, the Institute for Strategic Dialogue report recorded 203 incidents that targeted drag events online and offline across the U.S. The report found an increase in incidences where online anti-drag commentary led to offline activity against these events.

These threats are being carried out by not just anti-LGBTQ+ groups but also neo-fascist, white supremacist, parental rights and Christian nationalist groups, according to the study.

"The numbers in this report suggest that we run the risk of dangerous backsliding toward hate and violence directed at LGBTQ+ people," said Clara Martiny, digital research analyst of ISD, in a statement on the report.

The increase in threats coincides with the increased use of false anti-LGBTQ+ stereotypes by conservative figures that activists say have historically been used to marginalize the community and rile up a political base.

---

MORE: Gunned down in LGBTQ+ safe space, these Club Q survivors refuse to hide in fear

---

"It is no surprise that when political leaders advance anti-LGBTQ+ legislation and schools are forced to censor LGBTQ+ voices, anti-LGBTQ+ threats and harassment rise," Martiny said.

The Proud Boys is the leading group behind anti-drag activity, according to the Institute for Strategic Dialogue report. They've targeted 60 drag events, according to the report, with 39 protests resulting in verbal or physical altercations.

The social media account, Libs of TikTok, on Twitter and TikTok is one of the largest purveyors of anti-drag content.

The social media account, Libs of TikTok, on Twitter and TikTok is one of the largest purveyors of anti-drag content online, the Institute for Strategic Dialogue report states.

"The spread of anti-LGBTQ+ hate in the U.S. is advancing across the globe," said Dixon Osburn, Executive Director of ISD, United States in a statement. "It's imperative that policymakers address the rise of hate and extremism online and off. It starts with taking online threats seriously. We need to be proactive in protecting LGBTQ+ communities to avoid a snowballing effect of hate."



A Drag Queen duo salutes during a show to set a Guinness World record for the largest D...          **Show more**
Andres Kudacki/AP

## Other anti-LGBTQ extremism

Similar to the report from the Institute for Strategic Dialogue, the GLAAD and ADL report found that false "groomer" or "pedophilia" conspiracy theory was the most-cited anti-LGBTQ+ trope cited in 191 incidents of harassment, vandalism and assault.

According to the GLAAD and ADL report, almost half of all incidents -- 49% -- were perpetrated in some way by people associated with extremist groups.

MORE: Equality Act reintroduced in Congress to protect LGBTQ+ community

Perpetrators most frequently targeted drag events and performers, making up 138 of the more than 350 incidents. Schools and educators, health care facilities and providers and government buildings and elected officials were among the targeted places and people.

The ADL and GLAAD state that these figures only capture publicly reported incidents: "Since many anti-LGBTQ+ hate and extremism incidents go unreported, the true numbers are likely far higher," a statement from the groups read.

"We hope these stark findings serve as a wakeup call to lawmakers, civil society leaders, and community leaders to stand up to this onslaught of hate and support our LGBTQ+ community," ADL CEO Jonathan A. Greenblatt said in a

statement.

## Related Topics

LGBTQ



## Sponsored Content by Taboola

**These Barefoot Shoes are Leaving Neuropathy Experts Baffled**
Barefoot Vitality                                                                    Learn More

**Seniors on SS Are Now Entitled To These 12 "Kickbacks" In August (Tap For Full List)**
The-PenniSaver.com                                                                   Learn More

**Amazon's Worst Nightmare: Thousands Canceling Prime for This Clever Hack**
Coupon Code Finder

**NASA says Boeing's Starliner astronauts will return to Earth on different spacecraft in February**

**Angelina Jolie, Brad Pitt's daughter Shiloh granted name change**

**What polling shows about Americans' views of Robert F. Kennedy Jr.**

**Paw Licking Driving You Crazy? Top Vet Says To Make One Small Change**
Ultimate Pet Nutrition                                                               Learn More

**Unsold Cruise Cabins Cost Almost Nothing For Seniors (See Why)**
Online Shopping Tools

**The Horrifying Truth About CBD**
Tommy Chong's CBD                                                                     Shop Now

ABC News Network | About Nielsen Measurement | Children's Online Privacy Policy | Contact Us | Do Not Sell or Share My Personal Information | Interest-Based Ads | Privacy Policy
Terms of Use | Your US State Privacy Rights
© 2024 ABC News

# EXHIBIT F

## To Austin Decl.

**74**   days left to the 2024 election! Your ballot is your power, and when we show up, equality wins.

‹ **PRESS RELEASES**

# FBI's Annual Crime Report — Amid State of Emergency, Anti-LGBTQ+ Hate Crimes Hit Staggering Record Highs

*by* **Delphine Luneau**   •   October 16, 2023



SHARE 

*Attacks Based on Gender Identity Up 32.9% from Prior Year, Those Based on Sexual Orientation Up 13.8%; Race & Ethnicity-Based Hate Crimes Remain Largest Category*

**WASHINGTON —** The Human Rights Campaign (HRC) — the nation's largest lesbian, gay, bisexual, transgender and queer (LGBTQ+) civil rights organization — sounded the alarm today as the Federal Bureau of Investigation (FBI) released its annual crime report for 2022 showing that anti-LGBTQ+ hate crimes were up sharply from the prior year, with a 13.8% increase in reports based on sexual orientation and a shocking 32.9% jump in reported hate crimes based on gender identity

**In response to the FBI's 2022 report, Human Rights Campaign President Kelley Robinson released the following statement:**

> "The rise in hate crimes against the LGBTQ+ community is both shocking and heartbreaking, yet sadly, not unexpected. The constant stream of hostile rhetoric from fringe anti-equality figures, alongside the relentless passage of discriminatory bills, particularly those targeting transgender individuals, in state legislatures, created an environment where it was sadly foreseeable that individuals with violent tendencies might respond to this rhetoric. The FBI's data serves as another alarming indicator of the state of emergency our community finds itself in.

> "We also know that this data is incomplete, that too many cities and states are reporting incomplete data, or even no data at all, on hate crimes against the LGBTQ+ community. If we're going to bring a stop to that violence, we need a full accounting of just how many hate crimes are taking place – and that requires every jurisdiction stepping up."

The FBI's report noted that there were 1,947 recorded incidents relating to an alleged victim's sexual orientation in 2022, up from 1,711 the year before, and 469 relating to an alleged victim's gender identity, vs. 353 the year before. The gender identity category included 338 instances that were specifically anti-transgender and 131 that targeted someone who was gender noncomforming.

Race/ethnicity motivated hate crimes remained the largest category with 56% of all hate crimes. Hate crimes based on religion moved into second, just ahead of sexual orientation.

More than 1 in 5 of any type of hate crime is now motivated by anti-LGBTQ+ bias, and HRC in recent years has been tracking a horrifying wave of fatal violence against transgender people, especially Black transgender women.

Even with these horrifying stats, the problem of incomplete data reporting for hate crimes is a longstanding one. In the "Blueprint for Positive Change," a document released in November 2020 that offered a roadmap toward equality for the then-incoming Biden-Harris administration, HRC called for the Department of Justice to intensify efforts to encourage local law enforcement to report hate crimes statistics annually. While positive steps have been taken by the administration to improve reporting compliance, more is necessary in order to ensure more accurate and complete hate crimes reporting, including making the reporting mandatory.

The FBI's report comes amid an unprecedented spike in anti-LGBTQ+ state legislation, with more than 550 bills introduced in 43 states, and more than 80 signed into law — more than doubling last year, which was previously the worst year on record. The wave of harmful and discriminatory legislation — some of which was engineered and championed by extremist GOP candidates running for president and their allies — and the concurrent spike in anti-transgender rhetoric and violence prompted HRC in June

to declare a national state of emergency for LGBTQ+ people for the first time in the organization's more than 40-year history.

*The Human Rights Campaign is America's largest civil rights organization working to achieve equality for lesbian, gay, bisexual, transgender and queer people. HRC envisions a world where LGBTQ+ people are embraced as full members of society at home, at work and in every community.*

## Contact Us

To make a general inquiry, please visit our contact page. Members of the media can reach our press office at: (202) 572-8968 or email press@hrc.org.

TOPICS:

**Hate Crimes**

# Love conquers hate.

**Donate Today**

# EXHIBIT G

## To Austin Decl.

**LIVE:** RFK Jr. set to speak amid speculation he'll drop out of 2024 race

LGBTQ

# FBI crime statistics show anti-LGBTQ hate crimes on the rise

**BY BROOKE MIGDON - 10/16/23 6:22 PM ET**

Share          Post          • • •     More



*File — With the U.S. Capitol in the background, a person waves a rainbow flag as they participant in a rally in support of the LGBTQIA+ community at Freedom Plaza, Saturday, June 12, 2021, in Washington. The U.S. House overwhelmingly approved legislation Tuesday, July, 19, 2022, to protect same-sex and interracial marriages amid concerns that…*

Anti-LGBTQ hate crimes rose sharply in 2022, jumping more than 19 percent over 2021, according to the FBI's annual crime report released Monday.

More than 11,600 hate crime incidents were reported to the FBI in 2022, the highest number recorded since the agency began tracking them in 1991. A majority of hate crimes recorded last year targeted Black people, according to the report.

---

ADVERTISEMENT

---

Hate crimes targeting LGBTQ people were up significantly compared with 2021, with 622 reported single-bias, anti-LGBTQ hate crimes. Hate crimes motivated by an anti-transgender bias rose more than 35 percent year over year, reaching 338 incidents.

Kelley Robinson, president of the Human Rights Campaign, a national LGBTQ civil rights group, described the increase in hate crimes as "both shocking and heartbreaking, yet sadly, not unexpected."

"The constant stream of hostile rhetoric from fringe anti-equality figures, alongside the relentless passage of discriminatory bills, particularly those targeting transgender individuals, in state legislatures, created an environment where it was sadly foreseeable that individuals with violent tendencies might respond to this rhetoric," Robinson said Monday in a statement.



**Get a lot MORE for way less with Optimum**

■ **Optimum** - Sponsored      **Learn More**

Robinson, who testified before Congress last year during a first-of-its-kind hearing on surging anti-LGBTQ violence and hate speech, added that Monday's FBI data "serves as another alarming indicator of the state of emergency our community finds itself in."

The Human Rights Campaign in June declared a national state of emergency for LGBTQ people in the U.S. for the first time in its 40-year history, citing the passage of laws that target the community. More than 500 anti-LGBTQ bills were introduced in state legislatures this year, according to the American Civil Liberties Union (ACLU), and at least 84 became law. Most measures threaten to roll back the rights of transgender young people.

President Biden denounced laws that target LGBTQ people as "hateful" and "dangerous" during a speech Saturday at the Human Rights Campaign national dinner in Washington.

ADVERTISEMENT

"Families across the country now face excruciating decisions to move to a different state to protect their child from dangerous anti-LGBTQ laws," he said.

Biden recognized several LGBTQ people and allies who lost their lives to anti-LGBTQ violence this year, including O'Shae Sibley, who was fatally stabbed while dancing at a Brooklyn gas station; Colin Smith, who was killed while defending a friend from anti-LGBTQ harassment; and Laura Ann Carleton, who was shot and killed by a man who made "disparaging remarks" about a rainbow Pride flag displayed outside her clothing store in Lake Arrowhead, Calif.

Biden similarly warned of increasing anti-LGBTQ violence last week in a statement marking the 25th anniversary of the killing of Matthew Shepard, a 21-year-old student at the University of Wyoming who was brutally attacked and later died of his injuries in one of the most notorious anti-gay hate crimes in U.S. history.

CONTENT CONTINUES BELOW SURVEY

**Exhibit 3:** Declaration of Justin Doe

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

STATE OF TEXAS, *et al.*,

        *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, *et al.*,

        *Defendants*.

No.: 6:24-cv-0306

**DECLARATION OF JUSTIN DOE
(pursuant to 28 U.S.C. § 1746)**

## DECLARATION OF JUSTIN DOE

I, Justin Doe, upon my personal knowledge, hereby declare as follows:

1. I am a United States citizen. I was born in Reading, Pennsylvania in 1977.

2. I currently live in Reading, Pennsylvania with my husband, Salvador, an immigrant from Mexico who has been living in the United States since 2004. I have lived in Reading for roughly the last twenty years.

3. I currently work at Rolex Watch USA. I have been working for the Rolex company for 17 and a half years. I received my associate's degree in Specialized Technology in 1997. I also went to watch-making school and graduated from there in 2005.

4. In 2008, I met my husband, Salvador. I was volunteering for a Pride event at a local gay bar when I saw Salvador for the first time. Since I was busy volunteering, I wasn't expecting to meet anyone that night, but there he was, just drinking a beer by himself and wearing a baseball cap. Although he was quiet, we instantly connected. We have been together ever since that night.

5. Over the years, our lives merged—Salvador has become close with my friends, and I have grown close to his family. In 2014, we took a big step and bought our first home together here in Reading. I learned that Salvador was undocumented right at the beginning of our relationship, but I didn't care about that at all. I knew that once things became more serious, there would probably be difficulties we would need to overcome because of his immigration status, but this did not change how I felt about Salvador. You cannot help who you fall in love with.

6. In March of 2017, Salvador and I got married in Reading. We had an intimate wedding with only six people at a Victorian mansion in the area that has since turned into a bed and breakfast. At that point in our lives, we knew we loved each other, and we were

committed to one another, so it just felt like it was the right time to take this step in our relationship.

7.  Salvador and I do not have children together, but Salvador is part of a very large family, with many siblings, nieces, and nephews, so we are part of a large and close family.

8.  Salvador and I have a beautiful Victorian-style home, and our life consists of a strong community filled with family, neighbors, and friends. We enjoy spending time together in our home. We also love to entertain as a couple when we have friends and family come over to the house.

9.  Salvador and I live in a great community here in Reading with strong community ties. Our community holds many public events and gatherings in the park, community tours of the public garden, LGBTQ+ Pride-related events, and other events for families and the entire neighborhood. We love to attend these events and connect with our neighbors.

10. My husband and I are very involved and take pride in our community as one that promotes architectural integrity, unity, and diversity. I am part of many boards and committees that oversee different aspects of the neighborhoods' buildings and important sites. Salvador is a pillar in the community and volunteers regularly.

11. After being together for almost sixteen years and married for over seven years, I feel very lucky to have Salvador as my husband. We have a great life together. But knowing that I could be separated from him at any moment because he is undocumented feels like a dark cloud always looming over us. It would be a nightmare if Salvador were not allowed to remain here in the United States, and I would be devastated if that ever happened. As a gay man, based on things that I have heard from Salvador's friends and family who are still in Mexico and living in Salvador's hometown, I also fear for Salvador's safety if he

were removed from the United States or forced to remain there due to delays in consular processing. In the area where he is from, members of the LGBTQ+ community are often subjected to discrimination and persecution, and there is high crime due to the presence of drug cartels in the area.

12. Apart from the life we've built together in the United States, Salvador and I would also love to travel abroad one day. We have decided that we would love to go to France first; we even started learning French together. However, we cannot travel as a couple until we can resolve Salvador's immigration status.

13. When we heard about the new parole-in-place process ("Keeping Families Together Parole"), I was excited and hopeful about what this would mean for our lives.  Ever since the Keeping Families Together Parole process was announced in June and we discovered that Salvador's case would likely qualify, Salvador and I have been in contact with his immigration attorney and working to gather all of the necessary documents required for the application. We met with the immigration attorney on August 18—the day before the program was officially open and a day before we submitted the form—to prepare for the filing and ensure we have collected all supporting documents and evidence.

14. On August 19, we submitted the Form I-131F, Application for Parole in Place for Certain Noncitizens Spouses and Stepchildren of U.S. Citizens, to the United States Citizenship and Immigration Services ("USCIS") so Salvador can be considered for Keeping Families Together Parole. I helped support Salvador in the filing of this form. The form required information about Salvador's immigration history and any criminal history, and information about our marriage. Salvador also submitted documentation showing his eligibility for this parole process.

15. I also previously filed an I-130 petition for Salvador, which has been approved. I fully intend to support Salvador in applying for adjustment of status later on so he can begin the process of one day hopefully becoming a U.S. citizen.

16. For most of my life, I never thought I would ever get married or find someone like Salvador to share my life with. I am living my dream. If Salvador were to be granted parole through the Keeping Families Together Parole process and allowed to stay in the United States as he goes through the adjustment of status process, it would mean everything to us and be a huge weight off my shoulders. It would allow me to continue living my dream with Salvador and sharing the life and community we have built together.

17. Like my husband, I decided to join this intervention because Keeping Families Together Parole is a life-changing opportunity for my husband and our family that we want to help defend. However, I still fear that because I have shared personal details about myself and my husband in this declaration, including details about our sexuality and relationship, using my real name in this intervention, which will be public on a national scale, could put us and our extended family at risk of being targeted or harassed because of our sexuality and because my husband is undocumented. Also, both my husband and I are identified by our real names in online public sources, so if we were to use our real names in this litigation, it would be easy for someone who is anti-LGBTQ+ and anti-immigrant to find out who we are and in what specific area we live.

18. For this reason, I respectfully ask the court to allow me to proceed as a defendant intervenor in this lawsuit under a pseudonym in order to protect myself and my family.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed at Reading, Pennsylvania on August 25, 2024.

Justin Doe